[Crim. No. 4086.    Third Dist.    May 3, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN
HENRY BREKKE, Defendant and Appellant.

Benjamin F. Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Ronald W. Tochterman, Deputy Attorneys General, for Plaintiff and Respondent.

VAN DYKE, J.*—An indictment was filed charging appellant with the murder of Julius Micheletti. Appellant entered pleas of not guilty and not guilty by reason of insanity. A jury found appellant guilty of murder in the second degree and determined that he was sane at the time the offense was committed. Appellant now appeals from the judgment entered.

On appeal two principal contentions of appellant are that the court erred in allowing the prosecution to call two psychiatrists to testify to appellant's state of mind at both the guilt and sanity phases of trial when appellant's constitutional rights had not been fully protected as required by the *Dorado* and *Escobedo* cases. A third contention is that it was error to allow a third psychiatrist (court-appointed) to testify on sanity.

There is no substantial conflict in the facts elicited at the trial.

Appellant, 16 years of age, was brought to the Sacramento County Juvenile Center at approximately 11:20 a.m. on August 19, 1964. He was taken to Unit F in the center after a short talk with the intake officer, who explained to appellant that the following day there would be a detention hearing, at which time the judge would determine whether appellant would be retained or released.

Later in the day, while in the bathroom of the gymnasium, appellant approached Joseph Masse, another boy confined to Unit F, and asked if Masse knew of any way that he, appellant, could get out. Then shortly after 8 p.m. while in the television room, another boy, Anthony Davis, also confined in the unit, heard appellant state that he wanted to break out; that he was going to wait until 12 o'clock, ring his buzzer, overpower the man who answered, remove his keys, and leave by the back door.

At approximately 8:20 p.m. one of the two counselors in

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

Unit F left the unit on an errand. Micheletti, the second counselor, was seated at the counselor's desk, which is located near the door. A ping pong table located in the center of the recreation room was between the counselor's desk and the pool table. Although there are two pool cue sticks in the unit, only one cue stick is allowed out when the boys are playing.

At approximately 8:30 p.m. Anthony Davis and Noel Kyles were playing ping pong. David Nicol was watching the ping pong game, and Joseph Masse was watching television but turned around when he heard a loud noise. All four boys witnessed essentially most of appellant's acts and testified to the following:

Appellant approached the desk where Micheletti was sitting and reading a book. He was carrying the pool cue. Holding the cue stick at the small end like a baseball bat, appellant started swinging with "all of his might," striking Micheletti first on the left side of his head, then on the right side, and again on the left side. Micheletti fell to the floor.

Appellant, handing the cue stick to Nicol (who let it drop to the floor), turned and said, "Anybody want to go with me?" or something like, "O.K., let's go," to no one in particular; appellant then went rapidly to the sliding patio door and tried to open it. This door led into a patio enclosed by a 12 to 15-foot high wall.

There was confusion: the 25 to 30 boys in the area got up, someone ordered everybody into the television room, and a boy referred to as "Sugar Man" pushed the button for the control room and called out that they had better get down there, that there was somebody dying. Finding the patio door locked, appellant turned away and said to those around him, "Nobody saw anything" or "Nobody saw nothing." He then sat down.

Max Rose, Superintendent of the Juvenile Center, was near the control counter at 8:30 p.m. when the emergency alarm sounded; he and others ran to Unit F when upon switching on the Unit F control they heard a high level of noise. When Mr. Rose and Thomas McKerras, the other counselor in Unit F who was returning to the unit, arrived, they saw Micheletti on the floor behind the counter in a large pool of blood, and the cue stick on the floor in front of the control desk.

The boys were sent to their rooms. Ten to fifteen minutes later appellant was removed from his bedroom in Unit F and placed in an isolated room near the front where he could be closely observed. Within 30 minutes appellant appeared to be

asleep, and around 2:30 a.m. Rose had difficulty in awakening appellant to talk to the officers who were investigating the case.

Micheletti died as a result of the blows he had received.

Appellant's defense consisted solely of testimony introduced to show his state of mind—to show that he was not capable of forming an intent to commit the offense charged. Appellant himself did not testify. His father testified to an injury to appellant's head at the age of five; that up until the time appellant was 11 to 13 years old he believed his false statements to be true; that appellant was a chronic bed wetter until he was 15 years of age; that he had a severe nervous reaction to polio shots in 1956 or 1957; and that in 1963 or 1964 he had fainted at school.

It was brought out that appellant was admitted to the Juvenile Center after an automobile accident; that after the accident he at first told the officers that he tried to end his life by deliberately crashing the car he was driving; later he claimed that the wheels had locked. The probation officer who so testified also testified on cross-examination that when he talked to appellant he noted nothing unusual to show any mental disorder.

Appellant then called as an expert witness Dr. George O'Brien, a psychiatrist who saw defendant on August 25 and September 7, 1964, at the request of appellant's counsel. It was his opinion that appellant was so severely psychotic and out of touch with reality that he was incapable of forming an intent to kill; that appellant lacked the mental capacity to carry out any cool or deliberate preconceived design to kill as a result of a deliberate decision to kill. Dr. O'Brien considered appellant as suffering from schizophrenia. As a basis for this opinion Dr. O'Brien considered appellant's background; what appellant had told him regarding the incident, i.e., he had killed a man and wished that he could forget it or that it had ever happened; that while he was striking the counselor he could think only of his girl friend, whom he wanted to join, and the senselessness of the act itself.

Throughout cross-examination Dr. O'Brien stood firm in his opinion that appellant was not competent to form an intent to deliberately kill a person.

In rebuttal the prosecution called two psychiatrists who had seen appellant, Doctors Ken Johnson and John Wright. Doctor Johnson, at the request of the probation office, saw appellant the day following the incident. Dr. Wright, a staff

psychiatrist, saw appellant while he was at Vacaville pending his trial.

Prior to their testimony appellant's counsel objected on constitutional grounds, under *Escobedo-Dorado* rules.

On *voir dire* Dr. Johnson testified that he was contacted by Mr. Thornton of the probation office to evaluate appellant's mental state, to determine whether appellant was mentally ill, and if he were dangerous and if so whether he ought to be removed to a security setup. That was his sole purpose in interviewing appellant—not for the purpose of eliciting statements regarding the crime.

The court ruled that Dr. Johnson could testify as to his opinion of appellant's capacity to form the requisite intent, but on direct examination the doctor was not to testify to any incriminating statements made by appellant during the examination. The court did not place any restrictions on cross-examination.

On direct examination Dr. Johnson testified that he saw appellant for an hour or less on the day following the incident, the 20th of August, to make a determination of appellant's mental state and not for the purpose of eliciting incriminating statements. However, it is apparent he discussed with appellant the facts of his assault on Micheletti. As a result of this interview he arrived at the opinion that appellant possessed the ability to premeditate and to form an intent to kill.

Even on cross-examination Dr. Johnson, adhering to the court's ruling, did not relate any statement regarding the incident that appellant may have made to him during the examination.

Appellant's objection to having Dr. Wright, a Vacaville Facility staff psychiatrist, testify was based in part on the fact that appellant was taken to Vacaville on a hold basis without his attorney's consent or being so informed, and that he was not given the opportunity to be present to object to appellant's submission to interviews, observations or treatments. Out of the presence of the jury, it was established that appellant had at no time admitted or made any statements to Dr. Wright regarding any deliberate intent to kill which would go to premeditation. The record does not contain the court's ruling, but Dr. Wright did testify.

Dr. Wright testified that appellant was "housed" at Vacaville from October 8, 1964, to June 24, 1965, pending his trial.

During this period Dr. Wright saw appellant daily in the unit; and as a routine duty, in conformity with American Hospital Association Standards, Dr. Wright, on March 8, 1965, did a psychiatric evaluation on appellant which lasted approximately 15 minutes. It was Dr. Wright's opinion that appellant in August 1964 did have the ability to premeditate and deliberate and form the intent to kill.

On the cross-examination of Dr. Wright it was brought out that appellant was quite distraught when he arrived; that he tried cutting his arm with a paper clip once; that for six months or less appellant was on tranquilizers; despite appellant's emotional disturbance, however, Dr. Wright testified that appellant was not mentally ill; he appeared to be oriented, had no trouble in communicating or understanding. He said the fact that appellant was on tranquilizers would not affect his psychiatric evaluation of him; moreover, the various drugs administered to appellant would not tend to suppress any overt psychotic behavior.

At no time did Dr. Wright testify or relate any incriminating statements that appellant may have made to him, though he had asked appellant as to details of the attack on Micheletti.

After the jury found appellant guilty of murder in the second degree, the parties stipulated that the evidence introduced during the guilt phase of the trial was to be incorporated in the insanity phase of the trial, and the jury was so instructed. Appellant's counsel, however, renewed his objection to the testimony of both Doctors Johnson and Wright.

Dr. O'Brien, appellant's expert witness, recalled, testified that it was his opinion that appellant was psychotic, a schizophrenic, and was unable to distinguish between right and wrong at the time of the assault, in effect, that he was legally insane.

Both Doctors Johnson and Wright were of the opinion that appellant knew of the nature and quality of his act at the time of the offense and that he could at that time differentiate between right and wrong. Neither doctor was of the opinion that appellant was psychotic.

Also assigned as error on appeal is the testimony of the prosecution's next witness, Dr. Walter Rapaport, one of the two court-appointed psychiatrists.

At the outset of the insanity phase, the prosecution made a motion that appellant submit to an examination by Dr. Rapaport. Appellant's counsel objected, stating that he was refus-

ing to allow appellant to submit to such an examination by Dr. Rapaport. The court deferred ruling on the motion. There is nothing in the record to indicate the court denied the prosecution's motion but appellant did not submit to an examination immediately prior to the sanity phase.

Prior to Dr. Rapaport's testimony, defense counsel again objected to any testimony given by Dr. Rapaport regarding any opinion he may have arrived at as a result of a brief talk he had with appellant, and from the records made available to him. This objection was based on the ground that Dr. Rapaport's opinion would be based on only that brief time he saw appellant, and the doctor's testimony would be prejudicial for it would bring out the fact that defense counsel was advising appellant not to submit to any psychiatric examination. The court overruled appellant's objection and allowed Dr. Rapaport to testify.

Dr. Rapaport testified that after the court, on June 25, 1965, had appointed him to examine appellant, he had received a letter from Mr. Wells, appellant's counsel, advising him that he was not going to permit him to examine appellant. The doctor called Mr. Wells and they reached an understanding that Dr. Rapaport could see appellant, but only in the presence of Mr. Wells.

Dr. Rapaport arrived in Sacramento on June 27th. Mr. Wells introduced appellant to the doctor. Leaving appellant, Mr. Wells took Dr. Rapaport to his office where he explained his position, let Dr. Rapaport read the various reports in Wells' file on appellant, including the report of Dr. Johnson, and discussed appellant's background, and the details of the offense. They then returned to appellant and the doctor asked appellant his name, age, birthdate and birthplace, questions which appellant answered. Mr. Wells then interrupted and told appellant he was not to answer any further questions.

From his conversation with Mr. Wells, the reports in Mr. Wells' office and his brief interview with appellant, Dr. Rapaport was of the opinion that appellant was not mentally ill at the time of the offense, nor was he suffering from a condition that would preclude him from knowing what he was doing, or the quality of what he was doing. He diagnosed appellant as being impulsive and hyperemotional, but not psychotic.

Now on appeal appellant contends it was prejudicial error to allow Doctors Johnson and Wright to testify at

both phases of trial and Dr. Rapaport to testify at the sanity phase of trial.

Appellant argues, as to Dr. Johnson's testimony, that at the time he was examined by Dr. Johnson he was not represented by counsel nor had he been advised of his constitutional right to remain silent, as required in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], inasmuch as Dr. Johnson's opinion was based on statements made by appellant regarding the offense where there had not been compliance with these constitutional requisites. That it was, in substantial part, so based is not denied.

We hold these objections untenable for the following reasons. In *Escobedo* the Supreme Court of the United States stated as follows (p. 490) : "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' . . . and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." In *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the Supreme Court said (at p. 706 [16 L.Ed.2d]) : 'Our holding . . . briefly stated, . . . is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.⁴'' [Footnote 4: "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused."] Throughout both *Escobedo* and *Miranda* the court was at pains to point out that the thrust of those cases was to discourage improper police action in violation of constitutionally declared rights. To implement this

policy, the court forbade use at trial of incriminating statements or confessions so obtained. Thus in *Escobedo* the court said (pp. 488-489) : ''We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation.'' And (p. 490), ''This Court also has recognized that 'history amply shows that confessions have often been extorted to save law enforcement officials the trouble and effort of obtaining valid and independent evidence. . . .' '' Further (p. 490), ''We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. . . . If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.'' In *Miranda* the courts noted (at p. 704) that ''This case [*Escobedo*] has been the subject of judicial interpretation and spirited legal debate since it was decided two years ago.'' Said the court (p. 706) : ''It was necessary in *Escobedo*, as here, to insure that what was proclaimed in the Constitution had not become but a 'form of words,' [Citations], in the hands of government officials.'' Said the court further (at pp. 707-708), in explanation and justification of the rules declared in *Escobedo* and *Miranda*: ''An understanding of the nature and setting of this in-custody interrogation is essential to our decisions today. The difficulty in depicting what transpires at such interrogations stems from the fact that in this country they have largely taken place incommunicado. From extensive factual studies undertaken in the early 1930's, including the famous Wickersham Report to Congress by a Presidential Commission, it is clear that police violence and the 'third degree' flourished at that time. In a series of cases decided by this Court long after these studies, the police resorted to physical brutality—beating, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions. The 1961 Commission on Civil Rights found much evidence to indicate that 'some policemen still resort to physical force to obtain confessions,' . . . . The use of physical brutality and violence is not, unfortunately, relegated to the past or to any part of the country. Only recently in Kings County, New

York, the police brutally beat, kicked and placed lighted cigarette butts on the back of a potential witness under interrogation for the purpose of securing a statement incriminating a third party. [Citation.]

"The examples given above are undoubtedly the exception now, but they are sufficiently widespread to be the object of concern. Unless a proper limitation upon custodial interrogation is achieved—such as these decisions will advance—there can be no assurance that practices of this nature will be eradicated in the foreseeable future."

Much more was said to indicate that the goal of the court was to insure so far as it could that improper questioning of suspects "initiated by law enforcement officers" would be discouraged and, hopefully, abandoned.

In the instant case little police investigation was necessary and little appears to have been done. The fact that appellant had committed a felonious assault on Micheletti which would probably result, as it soon did, in his death, was apparent with indisputable certainty. Within hours sheriff's deputies and a deputy district attorney had investigated the obvious, had interviewed appellant, and it further appears from the record that in the main if not entirely police investigation ceased before Dr. Johnson conducted his interview. While it appears that these officers and the deputy district attorney did not comply with *Escobedo-Dorado* rules, neither did they testify as to any incriminating statements appellant may have made to them. Extensive *voir dire* proceedings were conducted by the trial court in the absence of the jury concerning the admissibility of the testimony of the psychiatrist, Dr. Johnson. Dr. Johnson was employed by the California Adult Authority as a psychiatrist. After the sheriff's deputies and the deputy district attorney had concluded their interviews with appellant, the authorities at the Juvenile Center who still had custody and responsibility for the safekeeping of appellant requested Dr. Johnson to make a psychiatric examination of appellant to determine his mental state with regard to custody. On *voir dire* Dr. Johnson testified that he was contacted by Mr. Thornton, the county probation officer, and asked to see appellant and to determine what degree of disturbance was involved in the case, that is, was appellant mentally ill and, if he be considered dangerous, should he be removed to a security setup. His purpose was not to elicit incriminating statements.

From the facts elicited before the court on *voir dire,* it

appears without conflict that the interview of appellant by Dr. Johnson was not initiated by the law enforcement authorities but entirely by the staff of the Juvenile Center for the legitimate purpose and the single purpose of determining what custodial safeguards would be required both for the protection of appellant and for the protection of his custodians. There was ample reason for their having been concerned about these matters. There was his statement to the officers who first apprehended him that he had crashed his car into a tree in order to commit suicide. There were the facts of his unprovoked and senseless assault upon Micheletti. From a custodial point of view there was good reason why the Juvenile Center staff wanted to find out just what sort of custodial provisions and safeguards were required. And so, impliedly, the trial court found after extensive *voir dire*. We hold that *Escobedo-Dorado* rules have no application on the issue of admissibility of Dr. Johnson's testimony. His interview with appellant was not "initiated by law enforcement officers," nor, from the record, did they know anything about it.

What we have said also disposes of the contention that there was error in receiving the testimony of Dr. Wright, the psychiatrist at the Vacaville Facility, who during the course of appellant's stay at the facility observed him, and on one occasion, following hospital routines, examined him psychiatrically. Law enforcement authorities had nothing to do with the acts of Dr. Wright.

The same considerations and others to be noted also dispose of the contention that there was error in receiving the testimony of Dr. Rapaport. He was the psychiatrist appointed by the court under the statute which provides for such court appointments when the defense of diminished capacity or insanity is interposed. Such appointees are appointed for the benefit of both parties and of the jury and of court. By virtue of their appointment by the court they must be deemed to be neutral and unbiased. It is true that a defendant is not compelled to submit to an examination by them and in this case such refusal was made known to both appointees by counsel for appellant. But Dr. Rapaport, accepting the ban on interviews with appellant, based his testimony upon the report of Dr. Johnson, which was made available to him, and on other data which he was given. Objections to his testimony other than constitutional, were based upon the matter of the extent of his investigation and the sufficiency of the basis for

his opinion, in short, as going not to admissibility but to the weight of his testimony. They were properly overruled. (See, *Hope* v. *Arrowhead & Puritas Waters, Inc.,* 174 Cal.App.2d 222, 230 [344 P.2d 428] ; *People* v. *Lewis,* 186 Cal.App.2d 585, 601 [9 Cal.Rptr. 263].)

The final contention of appellant is that the evidence was insufficient to establish murder, but we need not discuss that. The record amply supports the verdict.

The judgment appealed from is affirmed.

Pierce, P. J., and Friedman, J., concurred.