[Crim. No. 19871. First Dist., Div. One. July 28, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
PRISCILLA E. PHILLIPS, Defendant and Appellant.

**Counsel**

Jonathan Matthew Purver, under appointment by the Court of Appeal, Ephraim Margolin and William S. Mount for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and Linda Ludlow, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GRODIN, J.**—Following a lengthy jury trial, appellant was convicted of murdering one of her two adopted children (Pen. Code, § 187), and of willfully endangering the life or health of the other (Pen. Code, § 273a, subd. (1)), by deliberately administering a sodium compound into the food of each of them. As grounds for reversal she asserts juror misconduct, the erroneous admission of certain psychiatric testimony into evidence, and the trial court's failure to instruct the jury *sua sponte* on diminished capacity. We find no reversible error and therefore affirm, for reasons which follow.

### SUMMARY OF THE EVIDENCE

By nearly all accounts, Priscilla Phillips was a kind, helpful and loving person, a dutiful wife to her husband and a devoted mother to their two sons, who at the time of trial were nine and six years of age. Highly educated, with a master's degree in social work, she was employed in the Marin County Health and Human Services Department. After the birth of her sons, she turned her attention increasingly to religious and civil volunteer work, and became active in a variety of community organizations. Among the many organizations to which she volunteered time and energy was the Child Protective Services Unit of the Marin County Child Abuse Agency.

After the birth of her second son in 1973, appellant developed physical symptoms which led to a hysterectomy in 1975. Deeply upset that she could not have another child, especially a daughter, appellant and her husband decided to adopt a Korean infant who had been found abandoned on the streets of Seoul. They called her Tia.

Tia arrived at the Phillips' household in November 1975. Appellant promptly took her to Dr. Aimy Taniguchi, a pediatrician at the Kaiser clinic in San Rafael, for examination. Dr. Taniguchi found Tia to be in good health except for a diaper rash and an ear infection, and pre-

scribed treatment for both. By late November the rash and the infection appeared to have been successfully treated.

On January 26, 1976, appellant brought Tia into the clinic and informed Dr. Taniguchi that Tia had a low-grade fever. A urine specimen revealed a urinary tract infection for which Dr. Taniguchi prescribed first a sulfur-based antibiotic, which did not appear to help, and then a different antibiotic, which worked successfully. Tia's ear infection recurred, however, and was twice treated in February.

On February 27, 1976, appellant brought Tia into the clinic and told Dr. Taniguchi that Tia had a fever and had vomited violently in the morning. The source of the fever could not be determined.

On March 2, 1976, appellant brought Tia to the clinic again and reported that she had been vomiting off and on since the last visit. The doctor believed that the ear infection might be persisting, and added another antibiotic. Later that day, appellant brought Tia into the Kaiser Hospital at San Rafael and told the doctor on call that Tia was having brief "staring spells," and Tia was admitted for observation.

Dr. William Leider, a pediatric neurologist from San Francisco Kaiser, was called in to evaluate Tia's condition, and a variety of tests were performed, including blood sugar and blood calcium tests, a urine culture, a lumbar puncture, X-rays, and an intravenous pyleogram, but the tests revealed no abnormalities. Dr. Al Baumann, an ear, nose and throat specialist, examined Tia, found evidence of a low-grade infection, and because of her previous ear infection recommended an operation called a myringotomy, which entails removal of fluid from the ear drums. The operation was performed on March 5. On March 6, Dr. Taniguchi informed appellant that all of the diagnostic tests were complete, that the results were normal, that the ear operation was successful, and that she planned to discharge Tia within 48 hours.

During the evening of March 6, however, while Tia was still in the hospital, she began to cry and was unable to be comforted. The next day she began to vomit and have diarrhea. Her diet was changed from regular baby formula to clear liquid, but she did not improve. By March 9 feeding by mouth was discontinued and Tia was given intravenous fluids. She improved and was given clear fluids by mouth, but on the evening of March 10 the diarrhea attacks recurred. Feeding by mouth was again discontinued, and the diarrhea stopped abruptly.

Tia remained hospitalized, and the pattern continued. Further diagnostic tests revealed no abnormality, and the doctors were baffled. In April 1976 she was transferred to Kaiser Hospital in San Francisco, where a central venous hyperalimentation device was implanted through a catheter to permit introduction of nutritious fluids. She remained in San Francisco until June 8, 1976, and was then returned to Kaiser San Rafael to monitor her progress on nasogastric feeding. On July 7, 1976, she was taken to Stanford Medical Center for an intestinal biopsy. Although playful and alert when admitted, by the evening of July 8 she had developed cramps, acute diarrhea, and projectile vomiting. The diarrhea stopped abruptly the next morning. On July 10 Tia was transferred to a San Francisco hospital for the performance of a laparotomy to explore for tumors. Two days later, while at that hospital, Tia had another bout of diarrhea. Her doctors found this "inexplicable." On July 14 or 15, while still at the San Francisco hospital, appellant suggested that Tia be given solid foods. The doctors agreed to try her suggestion, and it appeared to work. Tia "really did very well" and had normal body functions. On July 28 she was discharged. The laparotomy was not performed.

On August 6 appellant called Dr. Taniguchi and told her that Tia's illness had recurred, that she was very sick with vomiting and diarrhea. Upon examination at the hospital, Tia was found to be severely dehydrated, lethargic, and unresponsive to stimulation. Tests revealed she was suffering from an extreme level of sodium in her blood. This finding coincided with prior readings, taken during periods when Tia was having attacks of diarrhea and vomiting; these findings also showed abnormally high levels of blood serum sodium, and of bicarbonate. The doctors had no explanation for this phenomenon.

Tia was admitted to the hospital, improved rapidly, and was released on August 9. On August 23, however, she was again hospitalized with the same symptoms. Abdominal X-rays showed no obstruction of the intestinal tract. She was discharged on August 28 but the symptoms reappeared and she was hospitalized twice in September and twice in October. Electrolyte readings continued to fluctuate, but again, all diagnostic tests were normal. In November 1976 a laparotomy was performed at Kaiser Hospital in San Francisco, but it revealed no abnormalities. Tia was discharged on November 26.

On December 3, 1976, Tia was examined by her pediatrician and was found to be doing well. Three days later she was back in the emergency

room in shock, vomiting convulsively, and displaying elevated sodium and bicarbonate levels. On December 11, having improved to the point that she could take formula, she was discharged. Less than three hours later she was back with the same symptoms, and was discharged again on December 22. A similar episode occurred in January 1977.

On February 2, 1977, appellant brought Tia to the emergency room for the last time. The child was in critical condition. She was having generalized seizures. She had an extreme level of sodium in her blood. An X-ray showed aspiration of vomit into her right lung. She was unable to eliminate carbon dioxide from her body, and she began to demonstrate abnormal posturings which indicated damage to her central nervous system. She died on February 3.

Several months after Tia's death, appellant and her husband adopted another Korean infant whom they named Mindy. On February 3, 1979—the anniversary of Tia's death—appellant brought Mindy to the hospital. The child had been vomiting, and she had diarrhea. Mindy was admitted to the hospital; her symptoms eventually subsided; and she was discharged on February 10. On February 16 Mindy was hospitalized again with the same symptoms. Her sodium level was elevated. Dr. Taniguchi began to note similarities between Mindy's case and Tia's case: "[T]hinking about it as objectively as possible, I realized that these two girls were not related in any way and . . . it just seemed incredible that they could even possibly have the same type of problem. . . ." At a pediatric staff conference on February 22, all doctors present agreed that "it was important to consider the possibility that this child was being poisoned."

The following day Dr. Arnhold, a pediatrician at Kaiser, gave Dr. Taniguchi a copy of an article from the Journal of the American Medical Association concerning a form of child abuse which had been reported in the British Medical Journal, Lancet, by a physician named Meadow. The article noted Meadow's observations of a case in which one little girl underwent innumerable manipulative, anesthetic, radiologic and surgical procedures during the six years of her life because her parents provided false information about her symptoms, tampered with her urine specimens, and otherwise interfered with observation by physicians and nurses; and of a second case in which a 14-month-old infant died of hypernatremia after repeated hospital admissions for vomiting and drowsiness that were precipitated by ingestion of large quantities of salt given to her surreptitiously by her mother. Both mothers appeared

to be loving, cooperative, and appreciative of the care given to their children. Dr. Meadow had denominated the phenomena "Munchausen syndrome by proxy," after the so-called "Munchausen syndrome" in which a patient beguiles a physician into performing unnecessary diagnostic and surgical procedures on the basis of false reports of symptoms.

Dr. Taniguchi proceeded with a series of tests to determine a medical cause for Mindy's symptoms: "Again, I was faced with the puzzling finding of an elevated sodium; and for the first time [I] began to look at it in terms of what was going into the patient and what was coming out of the patient. And, it did not add up. There was much more coming out than was going in." Mindy continued to have diarrhea. Sodium levels were abnormally high.

On February 24, around 2:45 p.m., Leslie McCarcy, a pediatric nurse at the hospital, arrived on duty and received a report from Cathy Place, the outgoing nurse. The question of Mindy's formula came up. Appellant was in Mindy's hospital room at the time. According to Nurse McCarcy, "Mrs. Phillips came out to the desk and Cathy asked her if she had made up the formula and Mrs. Phillips said yes, she had. It was in the refrigerator."

The next morning, February 25, the pediatrician on duty checked Mindy's intake and output charts. "I found that indeed, there was a large amount of unaccountable sodium in Mindy's stool and urine.... She was losing about five times the amount of sodium she was receiving." The doctor then went to the nurse on duty and asked her where Mindy's formula was kept. He took a sample of the formula and had it analyzed. The sodium content was 448 milliequivalents per liter. According to the manufacturer's specifications, the sodium content should have been only 15 milliequivalents per liter. The doctor had Mindy's formula replaced and transferred her to the intensive care unit.

Appellant was forbidden to feed Mindy, and was forbidden to visit the child except in the presence of a nurse. She was told that sodium appeared to be the cause of Mindy's illness, and that some sort of laxative salt might be a cause of the diarrhea. Appellant said, "I don't know anything about things like that," and asked what the doctor was going to do. When he told her that under the circumstances it was his obligation to call the Child Protective Services, appellant became downcast and said, "Then I'll be a suspect."

Once Mindy was placed in the ICU unit, she recovered quickly. She "seemed fine. . . . She did not have any more diarrhea at all. . . . She ate well, she was happy. . . ."

Dr. Boyd Stephens, Coroner of the City and County of San Francisco, testified on the basis of his observations that the cause of Tia's death was sodium poisoning, and that the amount of the sodium was so high that it had to have been administered into the gastrointestinal tract. Dr. Malcolm Holliday, Professor of Pediatrics at the University of California, concurred, and concluded that since Tia's chloride levels were normal, and her bicarbonate level was high, that the form of the salt was sodium bicarbonate. He testified that two to three teaspoons of sodium bicarbonate, dissolved in liquid, would have been sufficient to produce the symptoms which Tia and Mindy displayed.

At each of the hospitals to which Tia was admitted, parents were encouraged to participate in the care of their infants and young children; and mothers were permitted to remain overnight and to feed their babies. Throughout Tia's hospitalizations, appellant visited frequently and for prolonged periods of time. Because of her dedication, she won the admiration, sympathy, and respect of hospital staff members. Because of her obvious intelligence, her frequent presence, and her willingness to help, she was allowed to perform "minor nursing chores," including administration of formula through the nasogastric tube. The pediatric facility at each hospital had a small room or kitchen area, not visible from the nursing station, which contained an unlocked refrigerator for formulas and other foods. Appellant had access to those areas.

In order to suggest a motive for appellant's alleged conduct, the prosecution, over the objections of defense counsel, presented evidence relating to the so-called "Munchausen's syndrome by proxy" through the testimony of Dr. Martin Blinder, a psychiatrist. Dr. Blinder had not examined appellant, nor had he treated patients who displayed the syndrome which was the subject of his testimony. Rather, his testimony was based upon various reports in professional journals, copies of which were made available to the jury.

In response to a hypothetical question, Dr. Blinder theorized that a mother who repeatedly and surreptitiously administered a cathartic sodium compound to her adopted children, under circumstances identical to those presented by this case, displayed symptoms consistent with Munchausen's syndrome by proxy. He testified that the syndrome "is

one in which an individual either directly or through the vehicle of a child feigns, simulates, or actually fabricates a physical illness.... Typically, the illness is a dramatic one." "And 'by proxy' simply means instead of the person making themselves ill, they go through the psychodynamic process in another. It's usually the mother.... She's outwardly devoted to the child and invariably, the child is very small, less than two years of age.... The mothers who perpetrate a child abuse or Munchausen's form of child abuse typically will transfer their own unmet parental needs ... onto pediatricians, nurses, spouses, maybe even the community and get from these people through their child's illness the attention and sympathy they never got from their own parents."

Describing the syndrome, Dr. Blinder continued: "The mother will flourish on the ward. She seems to almost to blossom in the medical drama of the hospital.... The concern, competence and intelligence of these mothers ... makes it hard for the doctors to suspect them as the possible cause of their child's illness .... When the mother is confronted with evidence that she in fact is responsible for the illness, [she] cannot accept responsibility, even when the evidence is incontrovertible.... The literature describes some mothers who are frankly psychotic.... But a great number of mothers who do this to their children are not overtly mentally ill." Asked about appellant herself—as opposed to a hypothetical mother—Dr. Blinder testified, "Without a clinical examination of this defendant herself, I cannot say with the necessary degree of certainty that she indeed is reflecting a Munchausen Syndrome."

Appellant testified in her own behalf. She denied that she had ever given Tia or Mindy sodium bicarbonate or any other sodium compound, and she denied that she had ever done anything to harm either child. She admitted that she had, on "some occasions," prepared Mindy's hospital formula herself. Friends, acquaintances, and hospital nurses testified concerning appellant's reputation for truthfulness and her care and deep concern for Tia and Mindy. Defense psychiatrists testified, based on their examinations of appellant, that her mental condition was "essentially normal" with "none of the distortions in thinking or emotion that have been described in the articles on Munchausen Syndrome by proxy or that one might expect if Mrs. Phillips had committed [the] alleged acts." According to defense experts, appellant was "not suffering from any significant mental disease or illness."

1. *The Trial court did not abuse its discretion in refusing to grant a new trial because of alleged misconduct by one of the jurors.*

After the verdict, appellant moved for a new trial on the ground (among others) that a juror had engaged in misconduct by conducting an at-home experiment involving the solubility of bicarbonate of soda in water. The motion was supported by declarations from defense counsel describing their posttrial discussions with that juror, in which he admitted conducting such an experiment. According to one of the declarations, the juror said he conducted the experiment during jury deliberations.

In their opposition to the motion, the prosecution submitted a declaration from the juror, Jerome Polizzi. Mr. Polizzi stated that he had been contacted after the verdict by one of the defense attorneys, who engaged him in discussion as to why the jury voted the way it did. During the discussion, the attorney mentioned that there was no evidence as to how appellant brought sodium bicarbonate to the hospital, because her purse had been examined later and found to contain no sodium bicarbonate powder. Polizzi replied that she could have brought it in a number of ways, possibly in liquid form, or in a plastic bag, and that he hadn't given that much attention to that question. In connection with his suggestion that it could have been brought in liquid form, Polizzi made reference to the fact that he had dissolved some bicarbonate of soda in a glass of water at home.

This experiment, according to Polizzi, was conducted some time in April, during the course of the trial. One evening he placed about a teaspoonful of baking soda (sodium bicarbonate) in an eight-to-ten ounce glass of water, stirred it until it dissolved, and observed the following morning that it was still dissolved. He then added an additional four or five teaspoons full of baking soda to the solution, stirred it, and observed after five or ten minutes that the additional sodium bicarbonate had not dissolved, but had settled to the bottom of the glass. He then threw the mixture out. Polizzi declared that he "forgot about it completely and also didn't give any thought as to whether the defendant brought sodium bicarbonate to the hospital in liquid form and, in fact, never even mentioned it to anyone." Indeed, according to Polizzi, how appellant .brought sodium bicarbonate into the hospital was to his knowledge not discussed at all during the deliberations. Rather, what was discussed "and what I did conclude from the evidence was that she

... had free access to the Pediatrics Ward and had plenty of opportunities to give sodium bicarbonate to Tia and Mindy...." Relying in part upon Polizzi's declaration that he had not discussed the matter with other jurors, and in part upon the observation that the solubility of baking soda in water is "common knowledge," the trial court denied the motion.

Appellant contends that Polizzi's home experiment was misconduct, and that because it "attempted to supply a missing link in the prosecution's case—the method by which sodium was introduced into the infants' formulas during their various periods of hospitalizations," it must be considered prejudicial. We agree that it was misconduct, but in the circumstances of this case we conclude that the trial court's refusal to grant a new trial was not an abuse of discretion.

█ "Jurors cannot be permitted to investigate the case outside the courtroom" and "when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears." (*People* v. *Conkling* (1896) 111 Cal. 616, 628 [44 P.314]; see also *People* v. *Stokes* (1894) 103 Cal. 193, 196-197 [37 P. 207]; *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 207-208 [155 Cal.Rptr. 657, 595 P.2d 1].) And the presumption of prejudice cannot be overcome by a juror's affidavit denying that misconduct had any effect on the deliberations. "The law, in its wisdom, does not allow a juror to purge himself in that way." (*People* v. *Stokes, supra,* 103 Cal. at p. 197.) The presumption may, however, be overcome by evaluation of the misconduct in light of the entire record. (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 23-24 [147 Cal.Rptr. 208]; *People* v. *Bullwinkle* (1980) 105 Cal.App.3d 82, 92 [164 Cal.Rptr. 163].) █ Juror Polizzi's experiment was not inconsistent with any evidence presented at trial (*People* v. *Martinez, supra,* 82 Cal.App.3d at p. 23); it related to a matter which, as the trial court observed, is one of fairly common knowledge (*ibid.*); and the matter to which it related—the solubility of sodium bicarbonate in water—was, in light of all the evidence, tangential rather than critical to the case. It may have been critical for the jury to believe that appellant somehow brought sodium bicarbonate into the hospitals, and that she did so in such a way as not to leave traces of that substance in her handbags; but, as Juror Polizzi observed, there were many other ways known to persons of ordinary experience by which she could have carried the substance, independent of its solubility in water. "The result of the juror's independent investigation was not such as to adversely affect

the jurors' impartiality, lighten the prosecution's burden of proof, or contradict any asserted defense. The record shows that [appellant] could not have been prejudiced by the misconduct." (*People* v. *Bullwinkle, supra*, 105 Cal.App.3d at p. 92.) It follows that the trial court did not abuse its discretion in refusing to grant a new trial on that ground.

## 2. *Admission of Dr. Blinder's testimony was not error.*

Appellant argues, "The trial court abused its discretion and committed prejudicial error in permitting expert opinion testimony, in answer to a hypothetical question, on Munchausen syndrome by proxy, where the facts of the question related specifically to appellant and the named victims, where appellant's mental condition was not at issue, and where illness attributed to appellant was not recognized by medical profession." This composite argument contains several components, which we proceed to analyze.

### a. *The form of the hypothetical question.*

Dr. Blinder first testified as to his qualifications and his familiarity with medicine, psychiatry, family therapy, child abuse, and a group of symptoms called "Munchausen syndrome by proxy." He was then asked for a description of the Munchausen syndrome. The court requested that the prosecution proceed by means of a hypothetical question and then elicit a description of the syndrome. The prosecutor began: "I'll ask ... that you *assume* the following facts: Number one, that *the defendant, Priscilla E. Phillips*, did repeatedly and surreptitiously administer doses of a cathartic sodium-type compound over a period of approximately 12 months to first one *adopted Korean orphan, Tia Phillips*, ... and then engaged in similar conduct with a second *adopted Korean orphan, Mindy Phillips*, over a period of approximately one month until this *poisoning* was discovered by hospital officials." (Italics added.) At that point, the defense objected: "It's assuming the guilt of the defendant which is totally inadmissible in a criminal proceeding . . . ." The objection was overruled, and the prosecutor continued with his question. The defense then objected that the question was argumentative, complex, and assumed facts not in evidence. The objection was overruled, and the prosecutor continued with his question. The defense then objected to the prosecutor's use of appellant's name. The court thereupon instructed the jury to disregard the prosecutor's mention of appellant: "Strike Mrs. Phillips and just say the defendant involved in this hypothetical case, because it's entirely a hypothetical case present-

ed to the doctor and you're to consider it as such." The prosecutor continued with his question, substituting "the defendant" for "Mrs. Phillips." Further defense objections were overruled, and Dr. Blinder was permitted to testify, "I have an opinion. ... [Y]our hypothetical person evinces symptoms consistent with ... Munchausen's Syndrome by proxy."

Dr. Blinder then proceeded to describe the syndrome. He said that he could *not* render an opinion concerning appellant herself, because he had never examined her. Dr. Blinder's testimony continued until the afternoon recess. Immediately following the recess, the court *sua sponte* and without objection read to the jury CALJIC No. 2.82 concerning hypothetical questions. The court read the entire instruction twice, including the following sentence: "It is for you, the jury, to determine from all the evidence whether or not the facts assumed in a hypothetical question have been proved." This instruction was given again at the conclusion of the case, along with CALJIC No. 2.80, concerning expert testimony generally.

■ Appellant argues that the hypothetical question was phrased improperly in that the names of Mrs. Phillips and the alleged victims were repeatedly used, and that this impropriety was prejudicial because it may have led the jury to believe that Dr. Blinder was expressing an opinion about Mrs. Phillips' mental condition when, in fact, he had never met her, much less examined her.

We do not agree. That Dr. Blinder had never met or examined appellant was made clear to the jury repeatedly. Thus, any impropriety in the form of the question could not have misled the jurors. Dr. Blinder was saying, in effect, that the conduct ascribed to appellant was explicable in terms of the syndrome which had been reported in the literature. Whether that testimony was properly admitted is the key question, to which we now turn.

b. ■ *Admissibility of psychiatric evidence by the prosecution where defendant has not made her mental state an issue.*

Appellant suggests this may be the "first time in the history of California criminal jurisprudence in which the prosecution was permitted to put into evidence, as part of its case in chief, the mental condition of the defendant without the issue first being raised either by plea or by the introduction of the defendant's state of mind as part of the de-

fense." That may be true, but it is hardly persuasive as to the admissibility of such testimony. The rules of evidence do not preclude innovation.

While a prosecutor ordinarily need not prove motive as an element of a crime (*People* v. *Durrant* (1897) 116 Cal. 179, 208 [48 P. 75]; *People* v. *Planagan* (1944) 65 Cal.App.2d 371, 402 [150 P.2d 927]), the absence of apparent motive may make proof of the essential elements less persuasive (*People* v. *Beagle* (1972) 6 Cal.3d 441, 450 [99 Cal.Rptr. 313, 492 P.2d 1]). Clearly that was the principal problem confronting the prosecutor here. In the absence of a motivational hypothesis, and in the light of other information which the jury had concerning her personality and character, the conduct ascribed to appellant was incongruous and apparently inexplicable. As both parties recognize, Dr. Blinder's testimony was designed to fill that gap.

The evidence was thus relevant, and therefore admissible "[e]xcept as otherwise provided by statute" (Evid. Code, § 351). Appellant points to no statutory provision which would preclude the prosecutor from introducing otherwise admissible psychiatric testimony relevant to motivation on the ground that the defendant had not placed his or her mental state in issue.

Appellant relies upon *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 880 [56 Cal.Rptr. 635, 423 P.2d 787], as standing for the proposition that such evidence should not be permitted. That case and its predecessor, *In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33], involved the constitutional issues posed when a court-appointed psychiatrist is permitted to testify to incriminating statements made to him by the defendant in the course of the psychiatric interview. Dr. Blinder never interviewed defendant, and consequently no such constitutional issue is implicated here.

c. *Reliability of the evidence.*

Evidence Code section 801 describes the boundaries of expert testimony: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at

or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." Testimony outside these boundaries, i.e., "testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion," is subject to exclusion upon objection. (Evid. Code, § 803.)

The existence, nature, validity, and applicability to these facts of the phenomenon characterized as "Munchausen syndrome by proxy" are all matters sufficiently beyond common experience that expert opinion would assist the trier of fact, and appellant does not argue otherwise. Thus, the requirements of subdivision (a) of section 801 are satisfied. It is the provisions of subdivision (b) that form the focus of appellant's attack.

Under the provisions of subdivision (b), the fact that Dr. Blinder's testimony was based in large measure upon reports by others rather than upon his personal observations of the defendant or of other persons displaying that syndrome may affect the weight of his testimony but does not render that testimony inadmissible if those reports meet the standard of reasonable reliability. (See Jefferson, Cal. Evidence Benchbook (1972) § 29.4, 507-509; cf. *People* v. *Brekke* (1967) 250 Cal. App.2d 651, 661-662 [58 Cal.Rptr. 854].)

All of the studies cited by Dr. Blinder appeared in professional technical journals (cf. *Luque* v. *McLean* (1972) 8 Cal.3d 136, 148 [104 Cal.Rptr. 443, 501 P.2d 1163]) and were written by medical specialists on the basis of personal observations.[1] "While a layman may not testify to a fact which he has learned only by reading a medical book, there is no question that a professional physician may rely upon medical texts as the basis for his testimony. [Citations.]" (*Brown* v. *Colm* (1974) 11 Cal.3d 639, 644 [114 Cal.Rptr. 128, 522 P.2d 688].)

---

[1]Dr. Blinder, in the course of his testimony on direct examination, listed six authorities upon which he relied. Two of these, the report by Dr. Meadow published in Lancet and the summary of that report which appeared in the Journal of the American Medical Association, have previously been described. We here briefly summarize the other four.

In the November 1965 issue of Pediatrics there appeared a report by Dr. Mark S. Dine concerning a mother who fed her 19-month-old son perphenazine, a phenothiazine tranquilizer that had been prescribed for her own use. When confronted with the evidence that she had been poisoning her son, the mother's reaction was one of dismay

Appellant does not question Dr. Blinder's qualifications to appraise the reliability of these studies, nor does she suggest that information contained in them could feasibly have been presented except through the reported data. (*Ibid.*) Indeed, she does not directly question the trustworthiness of these studies at all, or the accuracy of Dr. Blinder's interpretation of them to the jury. Rather, she rests upon the proposition that Munchausen's syndrome by proxy is an "unrecognized illness . . . not generally accepted by the medical profession," and points to the fact that the syndrome is not listed or discussed as a form of mental illness in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.[2]

---

and denial. Dr. Dine suggested that "the poisoning of children by the deliberate administration of medications or other toxic substances" be regarded as a form of child abuse along with the previously recognized phenomena of the "battered child" syndrome, sexual molestation, and gross neglect; and he cautioned that "physicians who are responsible for the care of children must be alert to the possibility not only of physical trauma inflicted by parents, but also of deliberate drug intoxication as a cause of illness even when the history excludes this factor."

In the British Medical Journal for April 1976 there appeared an article by Rogers, et al., entitled *Non-accidental poisoning: an extended syndrome of child abuse.* The authors, physicians, psychiatrists and researchers at the Hospital for Sick Children and the poisons unit at Guy's Hospital in London, reported in detail six cases of nonaccidental poisoning of children by their parents. One of these involved a trained children's nurse who had administered small doses of salt to her two-month-old infant in her daily feeds. Referring to earlier studies involving such phenomena, the authors cautioned: "This manifestation of child abuse may be commoner than previously supposed."

In the September 1977 issue of the American Journal, Clinical Pediatrics, Drs. Fleisher and Ament from the departments of pediatric and medicine of the UCLA center for the health sciences reported their findings in three cases of children administered phenolphthalein in the form of laxatives by emotionally disturbed mothers. Based on their studies, they advanced the opinion that the mothers in these cases were using their babies' illnesses to elicit sympathetic interest and involvement when they felt such a need, and to inflict grief or frustration when they felt angry or retaliatory.

The same journal in June of the following year carried an article entitled *Intentional Poisoning of Two Siblings by Prescription Drugs: An Unusual Form of Child Abuse.* The authors, Drs. Hvizdala and Gellady of the department of pediatrics, University of Florida college of medicine, cited a study in 1975 by Kempe and Schmitt calling attention to intentional poisoning by prescription drugs as a form of child abuse. Their own report involved two instances of deliberate poisoning of children by parents. One of these was a mother who appeared concerned and anxious to help the physicians in determining the cause of her children's problems and who, when first evaluated by the Division of Family Services, was described as "a very responsible and capable parent." The authors noted the similarity to Munchausen's syndrome, and referred to the study by Meadow in Lancet. They concluded that "[t]he scarcity of reports may reflect the difficulty of recognizing this form of deliberate poisoning of children."

[2]From the record it appears that the manual is updated and revised from time to time, either by a committee or, as occurred on at least one occasion, regarding the exclusion of homosexuality as a listed mental illness, by majority vote of the member psychiatrists at a meeting. More recent editions of the manual do list Munchausen's syndrome as a category of mental illness.

We are aware of no such requirement. We are not confronted here with the admissibility of evidence developed by some new scientific technique such as voiceprint identification (cf. *People* v. *Kelly* (1976) 17 Cal.3d 24, 30-32 [130 Cal.Rptr. 144, 549 P.2d 1240]), nor with conflict within the scientific community. In *People* v. *Jackson* (1971) 18 Cal.App.3d 504, 507 [95 Cal.Rptr. 919], the court referred to the "'battered child syndrome'" as an "accepted medical diagnosis" on the basis of medical literature not unlike that presented here. The studies here show intentional poisoning of infants by their mothers to be another form of child abuse. In the absence of some reason to doubt their validity, we find no abuse of discretion in the trial court's decision to allow expert testimony based thereon.

In her brief on appeal, appellant makes general reference to Evidence Code section 352 as a basis for excluding Dr. Blinder's testimony. We acknowledge that the probative value of Dr. Blinder's testimony was somewhat speculative, and that it posed some risk of both confusion and prejudice: while it purported to attribute symptoms of mental illness to the defendant, it at the same time invited the jury to speculate that she was suffering from Munchausen's syndrome by proxy. Both risks were minimized somewhat, however, by the trial court's instructions and by the defendant's own witnesses. Were it within our function to determine independently whether the probative value of his testimony outweighed those risks we might have reached a different conclusion than the trial court did in this case, but under applicable principles that is not the question. The trial court has a wide range of discretion under section 352, and we cannot say that it abused that discretion by admitting Dr. Blinder's testimony into evidence.

3. *The trial court did not commit reversible error by failing to give instructions on diminished capacity sua sponte.*

In connection with the charge of Tia's murder, the trial court instructed the jury on all lesser included offenses, including statutory involuntary manslaughter. It did not, however, give any instructions on diminished capacity or on involuntary manslaughter by reason of diminished capacity, and no such instructions were requested. Appellant argues in light of Dr. Blinder's testimony and other evidence concerning Munchausen's syndrome the trial court had a duty to provide such

instructions *sua sponte*, and that its failure to do so was reversible error.

It has been held that "in any situation where malice aforethought or any other specific mental state must be established in order to find a charged or included offense, evidence of diminished capacity may be used to negate its existence. When such evidence exists the accused is entitled to an instruction which clearly indicates the full effect which a finding of its existence may bear on a crucial mental element of the charged and included offenses." (*People* v. *Poddar* (1974) 10 Cal.3d 750, 758 [111 Cal.Rptr. 910, 518 P.2d 342].) Diminished capacity would, of course, bear upon the *specific intent* requisite to commission of the felony upon which the resultant conviction of second degree felony murder was predicated, viz.: the crime of willfully mingling a harmful substance with food, drink or medicine with intent that the same shall be taken by any human being to his injury. (Pen. Code, § 347.) (7) This is so because "[d]iminished capacity is a defense to all specific intent crimes." (*People* v. *Cruz* (1980) 26 Cal.3d 233, 242 [162 Cal.Rptr. 1, 605 P.2d 830].) From the jury's finding of such a "specific intent" to perpetrate an "inherently dangerous felony" the "malice" essential to a second degree murder conviction will be ascribed. (*People* v. *Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130].) The question is whether the evidence required a *sua sponte* diminished capacity instruction concerning the underlying felony upon which the second degree murder conviction was based.

The evidentiary basis for such a diminished capacity instruction was by no means apparent. Insofar as the prosecution's evidence suggested that defendant might be suffering from a mental disease, the thrust of that evidence was directed toward defendant's supposed *motivation* in causing harm to her children, as distinguished from her *intent* to do so. (Cf. *People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961].)

It may be, and we assume, that if appellant had *requested* a diminished capacity instruction she would have been entitled to it despite the somewhat tenuous nature of the supporting evidence. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) To allow the prosecution to gain advantage from evidence suggesting mental illness on the part of defendant and at the same time to preclude the jury from considering the implications of such illness for the mental

state which the prosecution is required to prove would, under such circumstances, be incongruous if not unjust.

But appellant made no such request; instead, she flatly denied the conduct of which she was accused and presented psychiatric evidence designed to negate any inference that she was suffering from any mental illness or disorder whatever. If the jury believed her psychiatric evidence, there was no room for inference of diminished capacity.

Moreover, from the record it is quite clear that defense counsel considered, and rejected, the idea of a diminished capacity instruction. During a hearing outside the presence of the jury, the court considered with counsel, among other things, a proposed instruction relating to how intent is shown. The proposed instruction was based upon CALJIC No. 3.34, to the effect that intent is shown "by the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act," but it deleted the last paragraph of the instruction: "For the purposes of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct which, it is charged, constituted the crime described in the information." Defense counsel objected to the omission of the last paragraph on the basis of Penal Code section 21, which states in part, "All persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity." He argued, "There's been no substantial evidence that the defendant is in one of those three categories. Our position is that she's entitled to this presumption because it is a conclusive presumption." The following day, again in a hearing outside the presence of the jury, defense counsel renewed his objection, this time stating: "It is our claim that the diminished capacity must be raised by the defendant contrary to [the prosecutor's] claim here, and I cite People versus Lookadoo ... 66 Cal.2d 307 at page 316 on this point. This claim of diminished capacity has not been raised by the defense, and our position is that *the proposed amendment could be taken to mean that diminished capacity is somehow an issue in this case.*"[3] (Italics added.)

In *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], the Supreme Court distinguished between "the rule obliging

---

[3]In its instructions to the jury, the court included the previously omitted paragraph, and added: "Competent evidence may be considered to show whether the defendant did or did not possess the mental state required to sustain a charge of murder."

the court to instruct on lesser included offenses and to give requested instructions whenever there is 'any evidence deserving of any consideration whatsoever,'" and "the duty to give instructions, *sua sponte*, on particular defenses and their relevance to the charged offense." This latter duty "arises *only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.*" (Italics added.) This limitation on the duty of the trial court is necessary, the court declared, "not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon." (*Ibid.*)

Diminished capacity would appear to be a "particular defense" covered by the second *Sedeno* rule. Prior to *Sedeno*, it had been held that, "A claim of diminished responsibility is defensive matter and must be raised by the defendant in the trial on the issue of his guilt." (*People* v. *Lookadoo* (1967) 66 Cal.2d 307, 316 [57 Cal.Rptr. 608, 425 P.2d 208].) Characterization of diminished capacity as a "particular defense" is implicit in the court's discussion of that issue in *Sedeno* itself (10 Cal.3d at p. 721) and in subsequent Supreme Court opinions (e.g., *People* v. *Flannel, supra*, 25 Cal.3d 668, 684; *People* v. *Cruz, supra*, 26 Cal.3d 233, 242). And at least two Court of Appeal decisions have so held (*People* v. *Watts* (1976) 59 Cal.App.3d 80, 84 [130 Cal.Rptr. 601]; *People* v. *De La Plane* (1979) 88 Cal.App.3d 223, 248-249 [151 Cal.Rptr. 843]).

Clearly appellant was not relying upon a diminished capacity defense in her trial; and even if it could be said that there was substantial evidence supportive of such a defense, her counsel made quite clear to the court that such a defense was inconsistent with her theory of the case. As the trial judge observed at a posttrial hearing regarding appellant's release pending appeal (at which appellate counsel indicated he intended to raise this issue): "I think it would have been error on the part of the Court to give an instruction on diminished capacity in view of the defense which maintained that she was completely sane, suffered no diminished capacity and the experts who testified for the defense still maintain that she has no mental defect of any kind. For the Court to suggest that possibly she has by giving an instruction on diminished capacity might have been error and reversible error at that." We conclude that there was no error in the trial court's failure to give such an instruction *sua sponte*.

The judgment is affirmed.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied August 26, 1981, and appellant's petition for a hearing by the Supreme Court was denied October 22, 1981. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.