Affirmed and Opinion filed April 10, 2007








Affirmed and Opinion filed April 10, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-01012-CR

____________

 

KIMBERLY SUE AUSTIN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 209th
District Court

Harris County, Texas

Trial Court Cause No. 1014382

 



 

O P I N I O N

Appellant Kimberly Sue Austin was convicted of felony
injury to a child for injecting her young son with insulin and then sentenced
to ninety-nine years= incarceration.  The State=s theory was that
Austin suffered from Munchausen Syndrome by Proxy (AMSBP@), a mental
condition describing a caregiver, often a mother of young children, who
falsifies and/or induces illness in those cared for to gain attention and
sympathy.  In six issues, appellant challenges two of the trial court=s evidentiary
rulings and claims the trial court erred in refusing to grant a mistrial when a
witness testified in violation of a pretrial motion in limine.  We affirm.








                                                I.  Background

Appellant and her husband had four children:  Noah Austin
(the complainant), born on September 2, 1998; Joshua Austin, born on December
16, 1992; Robert Andrew Austin (hereinafter AAndrew@), born on August
31, 1991; and Brittany Austin, born on August 5, 1990.  Joshua died when he was
seven months old, and the medical examiner ruled the death to be from Sudden
Infant Death Syndrome (ASIDS@).  Noah, Andrew,
and Brittany have been living with relatives since September 2001 and are
healthy.

In April 2000, appellant and her husband and children lived
together with her husband=s parents, Judith Austin and Robert
Austin, Sr. (hereinafter ARobert@).  Appellant was
the primary caretaker of the children.  Robert was ill and suffered from
several conditions, including diabetes and dementia.  He was insulin dependent
and relied on others in the family, including appellant, to administer his
daily insulin injections.

On April 10, 2000, Noah=s father found him
in distress, apparently having a seizure.  Noah was stiff, cold, shaking, and
convulsing, and his father called 911.  Thereafter, Noah went into a deep coma
and was admitted to a pediatric intensive care unit, where doctors discovered
that he had a depressed glucose level and an elevated insulin level.  After
ruling out all possible natural causes for these conditions, doctors determined
that Noah had been injected with insulin, and a bruised injection site was soon
discovered on Noah=s arm.

The doctors suspected that Noah was the victim of MSBP, and
Children=s Protective Services
(ACPS@) was called to
investigate.  Based on Noah=s condition when his father found him,
authorities determined that he had been injected with insulin at a time when
appellant and Robert were the only adults in the house.  Appellant admitted
that she had access to insulin and often administered injections to Robert, but
she denied injecting Noah.  When asked to explain how Noah could have been
injected, appellant blamed the hospital staff and suggested that Noah Amust have rolled
over on a needle in his bed.@  The CPS investigator observed that when
appellant entered the room, Noah began to cry hysterically and did not calm
down until appellant left.








This was not the first time CPS had investigated appellant
and suspected MSBP.  In September 1993, five weeks after Joshua=s death, then two
year-old Andrew was admitted to a hospital for accidental drug ingestion (this
was the third time Andrew had accidentally ingested drugs), and appellant was
caught under circumstances strongly indicating she had injected Coca-Cola into
Andrew=s IV line. 
Appellant denied doing this and, as with Noah, blamed the hospital staff.  CPS
investigated and removed the children from the home for six months.  As part of
the investigation, CPS requested that appellant undergo a psychological
evaluation.  The psychologist strongly suspected MSBP but stopped short of
diagnosing it based on a lack of Aconcrete evidence@ that she had Asimulated or
produced@ illness in her
children.  Although the psychologist recommended that the children remain in
protective custody, they were returned to appellant.

Though Joshua=s death was
initially attributed to SIDS, the investigation surrounding Noah led to
suspicions that appellant was involved in Joshua=s death.  In 2002,
Joshua=s body was exhumed
and re-autopsied, and the medical examiner discovered a mark and crystallized
material consistent with an injection site.  This, in combination with the
injection of Noah, the incident with Andrew=s IV line, and the
pattern of medical incidents revealed in the children=s medical records,
led the medical examiner to issue a new death certificate showing Joshua=s death was a
homicide resulting from MSBP.

At trial, the State introduced two exhibits consisting of
thousands of pages of medical records from each of appellant=s four children. 
Using these records, five doctors testified that Noah, Joshua, Andrew, and
possibly Brittany were victims of MSBP.  Each doctor based his or her opinion
on some or all of these facts gleaned from medical records:

$                  
the incident
suggesting appellant injected Coca-Cola in Andrew=s IV,

$                  
specific
instances of hospitalizations and surgeries with little or no objective
verification of underlying symptoms, 

$                  
a general
pattern of reported symptoms, such as vomiting and apnea, never verified by
medical personnel, repeatedly occurring only when appellant was present, and of
the type that can be induced by actions such as exposing the child to a foreign
substance or smothering,








$                  
a comparison of
each children=s medical contacts, showing, for
example, a correlation between a decrease in one child=s medical contacts with a
simultaneous increase in another child=s contacts, 

$                  
hundreds of
total medical contacts for the four children, which is an abnormally high
number of contacts in the absence of any underlying chronic medical condition,
and

$                  
the
lack of hospitalizations, surgeries, or other evidence of serious, chronic
medical problems at times when the children were not in appellant=s care.

Appellant moved pretrial to exclude the children=s medical records,
arguing that the records constituted prior bad acts and were unfairly
prejudicial and thus inadmissible under Texas Rules of Evidence 403 and
404(b).  The trial court overruled appellant=s objections and
admitted the records as well as the medical testimony based on the records.

The State also introduced at trial an exhibit containing
two sets of psychological evaluations of appellant conducted during the CPS
investigations.  The first set related to the 1993 investigation into tampering
with Andrew=s IV line, and the second evaluation was conducted by
Dr. Lawrence M. Bramlette, a licensed psychologist, after Noah=s insulin
injection.  Dr. Bramlette also strongly suspected appellant had MSBP but
stopped short of making a definitive diagnosis without having a medical
professional review all of the children=s medical
records.  In reaching his conclusions, Dr. Bramlette relied in part on the
first evaluation, which contained a summary of an interview with Robert Austin,
Sr. in which he made many negative statements regarding appellant, including
criticizing her parenting skills, accusing her of stealing his insulin, and
stating that she lied about everything.  Appellant objected on hearsay grounds
and under Rule 404(b) to admitting this interview summary, but the trial court
overruled appellant=s objections.








Appellant also moved pretrial to exclude any mention of the
circumstances of Joshua=s death and the findings from the second
autopsy.  In the pretrial hearing, appellant presented testimony from another
medical examiner, who criticized the change in the death finding to a homicide
and said the finding should have been changed only to Acause undetermined@ rather than
stating the death resulted from MSBP.  The trial court excluded not only
evidence of the re-autopsy and change in cause of death but prohibited any
evidence that Joshua had died, ruling that it would be too prejudicial.  The
trial court allowed only testimony that appellant had no further contact with
Joshua as of July 28, 1993, which is the date Joshua died.  Despite ordering
the prosecutor to instruct all witnesses regarding this ruling, the prosecutor
failed to instruct Judith Austin, the children=s grandmother,
who, near the end of the final day of testimony, stated that Joshua had died. 
The defense moved for a mistrial, which the trial court denied after thoroughly
instructing the jury to disregard and polling each individual juror, who
indicated they could follow the trial court=s instruction.

The jury convicted appellant, and this appeal followed.  On
appeal, appellant challenges the trial court=s admission of her
children=s medical records,
the admission of the summary of the interview with Robert, and the trial court=s refusal to grant
a mistrial.

                                                    II.  Analysis

A. 
Evidentiary Issues

We
review a trial court=s decision to admit or exclude evidence for an abuse of
discretion.  Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App.
2000).  We will reverse a trial court=s decision to admit or exclude
evidence only when that decision falls outside the zone of reasonable
disagreement.  Id.

1.  Children=s Medical Records








In her first two issues, appellant argues the trial court
erred in admitting the medical records of her four children and testimony
regarding those records.  She claims that admission of this evidence, which the
State used to support its theory that appellant had MSBP based on her conduct
toward Noah and her other children, violated Texas Rule of Evidence 404(b)=s general
prohibition of evidence of extraneous bad acts.  She also contends that even if
admissible under Rule 404(b), the evidence should have been excluded as
unfairly prejudicial under Texas Rule of Evidence 403.  We address each
argument in turn.[1]

a.  Rule 404(b)

Rule 404(b) provides that A[e]vidence of
other crimes, wrongs or acts is not admissible to prove the character of a
person in order to show action in conformity therewith.@  Tex. R. Evid. 404(b).  However, such
evidence may be admissible for other purposes, such as Aproof of motive.@  Id.; accord
Wyatt v. State, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000).  Although only one
Texas court has done so, courts around the country have struggled  with the
evidentiary issues arising in MSBP cases, and they have consistently allowed
the prosecution to use evidence showing a defendant had MSBP to explain
motive.  See, e.g., Reid v. State, 964 S.W.2d 723, 730 (Tex. App.CAmarillo 1998,
pet. ref=d); People v.
Phillips, 175 Cal. Rptr. 703, 712 (Ct. App. 1981); State v. Hocevar,
7 P.3d 329, 346B47 (Mont. 2000); People v. Coulter,
697 N.Y.S.2d 498, 500 (Dist. Ct. 1999); State v. Cutro, 618 S.E.2d 890,
895 (S.C. 2005).  We agree that such evidence does not violate Rule 404(b).  A[A]lthough a
prosecutor ordinarily need not prove motive as an element of a crime, the
absence of an apparent motive may make proof of the essential elements of a
crime less persuasive.@  Reid, 964 S.W.2d at 730. 
Evidence suggesting appellant had MSBP was helpful to the jury in understanding
why this otherwise seemingly caring and devoted mother would intentionally
inject her son with unnecessary insulin.  As the Reid court explained, 








In the absence of a motivational
hypothesis, and in light of the other information which was before the jury
concerning appellant=s demeanor, personality and character,
including the fact that she was the mother of the child, without other relevant
and reliable evidence, the conduct ascribed to appellant was incongruous and
apparently inexplicable.  MSBP testimony would, if accepted by the jury, bridge
that gap.

Id.; accord Phillips,
175 Cal. Rptr. at 712.  Thus, because appellant=s children=s medical records
helped establish motive by showing MSBP, their admission did not violate Rule
404(b).[2]








In addition to helping to explain motive, admission of the
children=s medical records
was permissible under Rule 404(b) to provide context to the crime. A>[T]he jury is
entitled to know all relevant surrounding facts and circumstances of the
charged offense; an offense is not tried in a vacuum.=@  Prible v.
State, 175 S.W.3d 724, 732 (Tex. Crim. App.) (quoting Moreno v. State,
721 S.W.2d 295, 301 (Tex. Crim. App. 1986)), cert. denied, 126 S. Ct.
481 (2005).  Thus, evidence of extraneous matters is admissible as same
transaction contextual evidence under Rule 404(b) if it Ais so intertwined
with the State=s proof of the charged crime that avoiding reference
to it would make the State=s case incomplete or difficult to
understand.@  Id.; see also Gregory v. State,
56 S.W.3d 164, 177 (Tex. App.CHouston [14th Dist.] 2001, pet. dism=d) (noting that
evidence of extraneous acts was admissible because Ait was essential
for the jury=s understanding of the circumstances and the context
of events@).  Appellant argues the context exception is
inapplicable because the primary facts of this caseCa child was
injected with insulinCcan be understood on their own.  However,
the actions revealed in the children=s medical records
were not wholly separate from the offense but place it in context, showing that
appellant=s injection of Noah was not an isolated event but part
of a larger pattern of conduct toward her children.  Prosecuting appellant
without this evidence would certainly have made the State=s case more
difficult to understand, and thus the evidence was admissible under Rule 404(b)
on this basis as well.  See Prible, 175 S.W.3d at 732; Gregory,
56 S.W.3d at 177.

Appellant claims that evidence of her MSBP is classic conformity
evidence, admitted to show she acted consistent with a character trait.  She
argues this is no different than showing, for example, that a defendant had
kleptomania to explain why he committed theft.  We disagree.  MSBP describes
not appellant=s character but her behavior toward her children.  See
Hocevar, 7 P.3d at 346 (rejecting defendant=s comparison of
MSBP to kleptomania).  Further, the evidence was not admitted to show character
conformity but, as explained above, to explain motive and give context to
appellant=s otherwise inexplicable actions.  See Camacho v.
State, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (commenting that same transaction
contextual evidence Ais admissible, not for the purpose of
showing character conformity, but to illuminate the nature of the crime alleged@); Swarb v.
State, 125 S.W.3d 672, 681 (Tex. App.CHouston [1st Dist.] 2003, pet. dism=d) (noting that
same transaction contextual evidence is admitted Ato put the instant
offense in context,@ not to show that the appellant committed
the charged offense merely because he also committed the extraneous offense). 
The present case is different than a typical theft case, where evidence of an
underlying mental condition would not assist the jury in understanding the
offense.  We conclude the trial court did not abuse its discretion in admitting
the children=s medical records and accompanying testimony under
Rule 404(b).  We overrule appellant=s first issue.

b.  Rule 403

Rule 403 provides that relevant evidence Amay be excluded if
its probative value is substantially outweighed by the danger of unfair
prejudice.@  In her second issue, appellant argues that even if
her children=s medical records were admissible under Rule 404(b),
they should have been excluded as unfairly prejudicial under Rule 403.  In
conducting a Rule 403 analysis, the court is to consider (1) the probative
value of the evidence, (2) the potential to impress the jury in some irrational
yet indelible way, (3) the time needed to develop the evidence, and (4) the
proponent=s need for the evidence.  Prible, 175 S.W.3d at
733.








Hearing that appellant repeatedly induced and falsified
illnesses in her children, leading to unnecessary hospitalizations and
surgeries, could have affected the jury in an emotional way.  Also, even though
the State did not discuss each one of the voluminous medical records in detail,
half of its witnesses spent significant time testifying about matters contained
in the records.  Thus, the second and third factors weigh in appellant=s favor.  However,
the other factors clearly weigh in favor of admissibility.  Showing appellant
had MSBP was critical to establish a motive for injecting Noah, and the State
would have been unable to do so without the children=s medical
records.  See Reid, 964 S.W.2d at 732 (rejecting Rule 403 as basis for
excluding MSBP evidence); Hocevar, 7 P.3d at 347 (same).  Moreover, the
evidence was necessary to provide context for the offense, and Athe prejudicial
effect of evidence will rarely render it inadmissible if it proves the context
of the offense.@  Lockhart v. State, 847 S.W.2d
568, 572 (Tex. Crim.
App. 1992);
accord Nguyen v. State, 177 S.W.3d 659, 668 (Tex. App.CHouston [1st Dist.] 2005, pet. ref=d).  Though the
evidence was undoubtedly prejudicial to appellant, it was not unfairly so.  We
conclude the trial court did not abuse its discretion in admitting appellant=s children=s medical records
and accompanying testimony over appellant=s Rule 403
objection, and thus we overrule appellant=s second issue.

2.  Interview of Robert Austin, Sr.








In her third, fourth, and fifth issues, appellant
challenges the trial court=s admission of a summary of an interview
with Robert during a 1994 psychological evaluation of appellant.[3] 
This interview summary recounts Robert=s negative
opinions about appellant, including:

$                  
He accused
appellant of stealing insulin from his insulin bottle.

$                  
He stated that
appellant had Aa history of lying@ and that she Awill lie about everyday things such
as whether or not the mail has come for the day.@

$                  
He would not
eat food in his house because he was afraid appellant would put something in
the food.

$                  
He said that
appellant had Aa habit of drawing attention to
herself.@

$                  
He believed
appellant had given something to Andrew to make him sick.

$                  
He
said that appellant often did not perform everyday parenting tasks and Adidn=t care who kept
her kids as long as she don=t have to.@

Appellant claims the interview summary is hearsay and that
its admission violates the Confrontation Clause as well as Rule 404(b).

a.  Confrontation Clause

In her fourth issue, appellant claims admission of the
interview summary violates her right to confront witnesses because Robert was
deceased at the time of trial and therefore unavailable for cross-examination. 
See Crawford v. Washington, 541 U.S. 36 (2004).  The State responds that
appellant did not object on this basis to the trial court and therefore has not
preserved this issue for review.  We agree with the State and find appellant
has not preserved error on her confrontation complaint.








When the State offered the psychological evaluations,
appellant initially objected that the Robert interview summary was Aobviously hearsay@ and being Aoffered for the
proof of the matter contained.@  The State responded that Robert gave the
interview to a psychologist who was evaluating appellant=s mental status
and thus it was admissible under Texas Rule of Evidence 803(4) as a statement
made for the purposes of medical diagnosis or treatment.  Appellant=s attorney then
further explained her objection:

As the Court is aware, Mr. Austin,
Sr. is not available to be cross-examined as to whether or not he said these
things, that sort of stuff.  What we are faced with is a situation where the
jury, as well as everyone else in this courtroom, is going to have to accept
that these statements were made exactly this way, that the intent is exactly as
it=s expressed here. 
And, frankly, Judge, they are fairly prejudicial.  There are a lot of opinions
that are expressed in here, nothing that is subjective or can be objectively
verified.  There are a lot of opinions about her.  We feel that thoseCwhile the doctor
has the ability to consider those and can incorporate those within the context
of his diagnosis or opinions, the fact that they are included in here, we
believe, is beyond the scope of the hearsay exception.








To preserve a complaint for appellate review, the
complaining party must state the grounds for the desired ruling to the trial
court Awith sufficient
specificity to make the trial court aware of the complaint, unless the specific
grounds were apparent from the context.@  Tex. R. App. P. 33.1(a)(1)(A); Reyna
v. State, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005).  A hearsay objection
does not preserve error on Confrontation Clause grounds.  Reyna, 168
S.W.3d at 179; Lopez v. State, 200 S.W.3d 246, 255 (Tex. App.CHouston [14th
Dist.] 2006, pet. ref=d).  Appellant argues that the reference
to the inability to cross-examine the declarant was sufficient to make the
confrontation grounds of her objection apparent.  We disagree.  The context of
the argument shows appellant=s attorney briefly mentioned
cross-examination only in the context of making a hearsay objection.  Even if
such a minor reference to cross-examination could be construed to include a
Confrontation Clause objection, A[w]hen a defendant=s objection
encompasses complaints under both the Texas Rules of Evidence and the
Confrontation Clause, the objection is not sufficiently specific to preserve
error.@  Reyna,
168 S.W.3d at 179; see also Taylor v. State, No. 06-05-00033-CR, 2006 WL
66515, at *2 (Tex. App.CTexarkana Jan. 13, 2006, no pet.) (mem.
op.; not designated for publication) (finding that when defendant A[a]rguably, but
only tangentially, while arguing his hearsay objection, . . . briefly touched
on a claim that the evidence=s admission violated the Confrontation
Clause,@ he failed to
preserve error).  Because she failed to preserve error, we overrule appellant=s fourth issue.

b.  Evidentiary Rules

(i)  Rule 803(4)

In her third issue, appellant argues that Robert interview
summary was not admissible under Texas Evidence Rule 803(4).  Rule 803(4)
provides that statements Amade for purposes of medical diagnosis or
treatment@ are not excluded by the hearsay rule.  This exception
is based on the assumption that such statements are reliable because the
speaker appreciates that the correctness of the diagnosis or effectiveness of
the treatment may depend on the accuracy of the information given the doctor.  See
Ware v. State, 62 S.W.3d 344, 350B51 (Tex. App.CFort Worth 2001,
pet. ref=d); Fleming v.
State, 819 S.W.2d 237, 247 (Tex. App.CAustin 1991, pet.
ref=d).  Thus, the
declarant=s motive in making the statement must be consistent
with the purpose of promoting treatment.  Jones v. State, 92 S.W.3d 619,
623 (Tex. App.CAustin 2002, no pet.); Sandoval v. State, 52
S.W.3d 851, 856 (Tex. App.CHouston [1st Dist.] 2001, pet. ref=d).








The State argues that the interview summary was admissible
under Rule 803(4) because Dr. Bramlette used it in conducting his psychological
evaluation of appellant.  The State, however, fails to account for the speaker=s motive in making
the statement.  Nothing in the record suggests that Robert made the statement
for the purpose of diagnosing or treating appellant=s mental
condition.  In fact, his wife told the interviewer that they came to CPS
because they wanted possession of appellant=s children.  This
purpose is not necessarily consistent with accurately assessing appellant=s mental status in
that the more negatively Robert portrayed appellant, the better his chances of
gaining possession of her children.  See Smith v. State, 88 S.W.3d 643,
652 (Tex. App.CTyler 2000) (AUnlike facts related
by the patient herself, facts related by a third party whose motives may be
suspect do not bear the same indicia of reliability.@), vacated on
other grounds, 61 S.W.3d 409 (Tex. Crim. App. 2001); see also Jones,
92 S.W.3d at 623 (A[T]he declarant must first have a motive
consistent with obtaining medical care, knowing that proper diagnosis or
treatment depends on the veracity of such statements.@); Sandoval,
52 S.W.3d at 856 (A[T]he declarant=s motive in making
the statement must be consistent with the purpose of promoting treatment.@).  Thus, we
conclude the interview summary was not admissible under Rule 803(4).

(ii)  Rule 705(a)








Even if the trial court gives a wrong reason for its
ruling, we must uphold the ruling if it is correct under any applicable legal
theory supported by the record.  Armendariz v. State, 123 S.W.3d 401,
404 (Tex. Crim. App. 2003).  Thus, although the State argues that the interview
summary was admissible under Rule 803(4), it argues in the alternative that the
interview summary was also admissible to show the basis of an expert opinion.  See
Tex. R. Evid. 705(a).  Rule 705
provides that if the underlying data would be otherwise inadmissible, Athe court shall
exclude the underlying facts or data if the danger that they will be used for a
purpose other than as explanation or support for the expert=s opinion
outweighs their value as explanation or support or are unfairly prejudicial.@  Tex. R. Evid. 705(d).  Dr. Bramlette
testified that background information, such as interviews with appellant=s family members,
was important in his assessment of appellant and whether she had MSBP.  Most of
Robert=s statementsCparticularly
regarding appellant=s lying, drawing attention to herself, and
intentionally making Andrew sickCdirectly support
Dr. Bramlette=s opinions.  Disclosing this information assisted the
jury in evaluating the weight to give Dr. Bramlette=s opinions.  See
Ramirez v. State, 815 S.W.2d 636, 651 (Tex. Crim. App. 1991) (ADisclosing this
information enables the jury to evaluate the expert=s opinion and
ascertain the weight it wishes to attach to such testimony.@).  Although the
statements are prejudicial and there is some risk the jury could use them for
another purpose, we conclude this risk does not outweigh their value as
explanation and support for Dr. Bramlette=s opinions.  Thus,
the Robert interview summary was admissible under Rule 705, even if it was
otherwise inadmissible.[4]

c.  Harm Analysis

Even though we have concluded that the interview summary
was admissible to show the basis of the expert=s opinion, in the
alternative, we conclude that even if the Robert interview summary should not
have been admitted under any legal theory, any such error was harmless. 
Because appellant did not preserve her Confrontation Clause objection, any
error in the evidentiary ruling was non-constitutional.  See Bagheri v.
State, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003).  Thus, we must disregard
this error if it did not affect appellant=s substantial
rights.  See Tex. R. App. P. 44.2(b);
Casey v. State, No. PD-0548-05, __ S.W.3d __, 2007 WL 601629, at *9
(Tex. Crim. App. Feb. 28, 2007).  A substantial right is affected when an error
has a A>substantial and
injurious effect or influence in determining the jury=s verdict.=@  Scott v.
State, No. 14-05-01129-CR, __ S.W.3d __, 2007 WL 174347, at *4 (Tex. App.CHouston [14th
Dist.] Jan. 25, 2007, no pet. h.) (quoting King v. State, 953 S.W.2d
266, 271 (Tex. Crim. App. 1997)).  We must examine the record as a whole to
determine if the error had no influence on the jury or had but a slight
effect.  See Casey, 2007 WL 601629, at *9; Scott, 2007 WL 174347,
at *4.  Important factors include the nature of the evidence supporting the
verdict, the character of the alleged error, how the error might be considered
in connection with other evidence in the case, and whether the State emphasized
the error.  See Bagheri, 119 S.W.3d at 763; Scott, 2007 WL
174347, at *4.








After examining the record as a whole, we find that any
error in admitting the interview summary was harmless.  Although Robert=s comments
regarding appellant were quite negative, the jury already had substantial evidence
that appellant had, for nearly ten years, feigned or induced repeated illnesses
in her four children, resulting in multiple unnecessary hospitalizations,
medications, and surgeries.  Further, appellant was one of only two adults in
the house with Noah during the time he was injected, and she admittedly had
access to insulin and knew how to administer insulin injections.  The State
never specifically mentioned the interview summary during trial, and none of
the witnesses emphasized any of Robert=s statements. 
Thus, even though the jury requested to view the entire psychological
evaluation file during deliberations,[5]
given the small role this evidence played in the trial, especially in relation
to the other evidence supporting the verdict, we conclude the evidence did not
influence the jury or had only a slight effect.  Appellant argues that even if
the error was harmless in the guilt/innocense phase, she was harmed during
punishment because, Adespite being eligible for probation,
[she] received the highest punishment possible, other than a life sentence.@  However, during
punishment, the State introduced detailed evidence, without objection,
regarding Joshua=s death, the exhumation and re-autopsy of
his body, and revised cause of death finding reflecting that Joshua=s death was a
homicide resulting from MSBP.  In light of this evidence, we cannot say that
Robert=s negative
comments about appellant caused the jury to recommend a greater sentence than
it would have otherwise.

B. 
Mistrial

After lengthy pretrial discussions, the trial court granted
appellant=s motion in limine, ruling that the State could not
mention Joshua=s death and instructed the State to admonish all its
witnesses to avoid testifying about that issue.  However, the prosecutor failed
to admonish Judith Austin, who testified on the last day of trial as follows:

Q:      Well, you just said you didn=t usually have any concerns about
[the children] being with [appellant] or suspicions about her.  Tell us about
the times you did have concerns or suspicions.

A:      Only one time.

Q:      When was that?








A:      Well, my
husband and I were going with his mother to the funeral of a cousin in
Smithville.  And before I left, I said, we should have taken Joshua with us.  Maybe
I ought to ask, but I didn=t.  And he was sick that afternoon and
then he died later.

Appellant=s counsel
objected, and before the trial judge excused the jury to confer with the
attorneys, he gave the following instruction to the jury:  

Members of the jury, I am going to have to excuse
you.  It=s very, very important, don=t evenCwhen you go across the hallway, don=t even think about the last
response by Ms. Austin at all.  You will be instructed to disregard it in just
one moment, but we need to clear up a few things.  Don=t even think about it.  That=s not relevant in this case at all,
and we will talk about it in just one moment.

Appellant=s counsel
requested an instruction to disregard, which the trial court granted, and moved
for a mistrial, which the trial court denied.  When the jury returned, the
trial judge instructed the jury as follows:

Members of the jury, this happens from time to time,
that certain testimony is brought out before the jury that should never, everCand I mean ever be brought out
before the jury.  It was unresponsive.  The witness was not warned to not go in
that area, so don=t hold it against Mrs. Austin.  It=s not her fault.

It was brought before you.  I can=t be any stronger in admonishments
to you.  It=s important to please understand
this.  This last response concerningCI am going to say itCJoshua=s death, because it=s been brought out by the witness, that=s in no wayCI mean in no wayCto be considered by anyone on an individual basis.  You put
that out of your mind individually and certainly as a group of 12 people
deliberating tomorrow morning about this case.








If you don=t think you can do it in the morning, let me know and I am
going to declare a mistrial.  And during deliberations, if anyone brings it up
one time while you are deliberating, I want the other 11 to write me a note
saying a juror has brought this up, and I will bring you back in in the next
minute and declare a mistrial.  It is that important.  And I hope you
understand your responsibilities as a juror.  You are to consider only what the
Court decides is relevant in this case, because if you can=t, we decide cases upon speculation
[sic], and that=s the last thing in the world we
ever want to do in a case such as this, or any other case down here, whether we=re in county court or up in district
court.  It=s that important.

So, do some soul searching tonight.  If you don=t think you can put it out of your
mind, let me know in the morning and I will declare a mistrial.  If anybody in
deliberations brings that up, the other 11 please write me a note and I=ll bring you out.  I=m not going to be upset with
anybody for not being able to put it out of their mind.  I will just have to
declare a mistrial.

I=m going to count
on you.  If you can do it, fine.  If you can=t do it, that=s fine also.  We=ll start over this
case again next week.  It=s that important to confine your
interpretation of the evidence solely to what has been admitted before you,
what the Court feels is proper consideration by the jury.

Ms.
Austin then finished her testimony, and the State presented one last witness
who provided brief testimony.  Before dismissing the jury for the day, the
trial judge further admonished the jury.

Ladies and gentlemen, it=s been a long day.  Do me a favor,
as I said, it is that important, do some soul searching, each one of you, over
the evening.  Don=t talk to anybody about what has
happened and what I have asked you to do.  And in the morning, after both sides
have rested and both sides have closed, before the argument of counsel, before
I charge you on the law, I am going to ask each one of you:  Do you think you
can give the Court your complete assurance, more than just AI think,@ that you cannot consider the
statement by Mrs. Judith Austin in any way, in any way in deciding your own
individual fact-finding of this case, along with, of course, the participation
of the other jurors.

And I guarantee you, if you say, no, I can=t put it of [sic] out of my mind,
no one is going to get upset with you at all, but I=m going to declare a mistrial.  I=ll tell you that much right now,
because that was in violation of an order that the Court issued even before the
jury selection process.








I=ll leave it up to
you.  Do some soul searching.  Again, no matter what you decide, no one is
going to fault you in any way.  That=s for sure.  And I
will leave it up to you in the morning to let me know.

The
next morning, the State=s final witness concluded her testimony,
and the trial judge again addressed the jury.

Right now, I have to go back to the issue that was
brought up yesterday with Mrs. Austin=s testimony.  I=ve asked you to think about it.  I mean, it sounds like a
cliche, do some soul searching, but that=s exactly what I wanted you to do.  Give me your best, your
most honest, your most candid response.  Because it is that important.

I am going to ask each of youCand I have to do this
individually.  I am going to ask each of youCI tell you what.  Let me do this, I am going to ask the
alternates to take these two last seats.  I=m sorry.

What I need to do now, I am going to call out your
name and ask you to please stand where you are.  I will ask you individually: 
Can youCand this is for all of youCcan you follow the instructions by
the Court to disregard in any way the one response by Mrs. Austin concerning
Joshua.

If you can, just
say, AYes, I can.@  If you cannot,
just say, ANo, I cannot.@  That=s all I need to
know at this time.  I hate to spotlight you like this, but it has to be done
according to procedures.

The
trial judge then polled each individual juror, and each juror answered that he
or she could follow the court=s instruction.








In her sixth issue, appellant argues the trial court erred
in denying her motion for mistrial.  We review a trial court=s denial of a
motion for mistrial for abuse of discretion.  Hawkins v. State, 135
S.W.3d 72, 77 (Tex.
Crim. App. 2004); Hudson v. State, 179 S.W.3d 731, 738 (Tex. App.CHouston [14th Dist.] 2005, no pet.).  AA mistrial is the
trial court=s remedy for improper conduct that is >so prejudicial
that expenditure of further time and expense would be wasteful and futile.=@  Hawkins,
135 S.W.3d at 77 (quoting Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)).  Mistrial
is required A[o]nly in extreme circumstances, where the prejudice
is incurable.@  Id.; see also Hudson, 179 S.W.3d at
738 (AA mistrial is an
extreme remedy for prejudicial events that occur at trial and should be
exceedingly uncommon.@).  In analyzing whether the prejudicial
event is so harmful that the case must be redone, we consider (1) the
prejudicial effect, (2) the curative measures taken, and (3) the certainty of
conviction absent the prejudicial event.  See Hawkins, 135 S.W.3d at 77
(citing Mosley v. State, 983 S.W.2d 249 (Tex. Crim. App. 1998)).  A prompt instruction to disregard
will usually cure any prejudice resulting from improper testimony regarding an
extraneous offense, even if given in violation of a motion in limine.  See
Hinojosa v. State, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999); Herrero
v. State, 124 S.W.3d 827, 836 (Tex. App.CHouston [14th
Dist.] 2003, no pet.).

Appellant argues the trial court abused its discretion in
refusing to grant a mistrial because the evidence regarding Joshua=s death was so
prejudicial that it was impossible for the jury to disregard.  See Kemp v.
State, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992).  She asserts that the
trial court=s extensive efforts to cure the prejudice both
demonstrate the inflammatory nature of the evidence and actually made the
situation worse by repeatedly calling more attention to the evidence.[6] 
Thus, she claims she was entitled to a new trial.  We disagree.








Though evidence of Joshua=s death was
certainly prejudicial, the prejudicial impact is lessened by considering this
evidence in the context of the entire trial.  The jury had already heard
extensive evidence that appellant had, directly and indirectly, repeatedly
injured each of her children, including injecting Noah with insulin and sending
him into a coma.  Further, the judge=s instruction to
disregard was prompt, unequivocal, and forceful.  See Hudson, 179 S.W.3d
at 738B39.  We are to
presume the jury followed these instructions.  See Hinojosa, 4
S.W.3d at 253; Herrero, 124 S.W.3d at 836; see also Waldo v. State,
746 S.W.2d 750, 753 (Tex. Crim. App. 1988) (noting that Athis court puts
its faith in the jury=s ability, upon instruction, consciously
to disregard the potential for prejudice, if any, in its deliberations@ (internal
quotation marks omitted)).  Beyond this presumption, the trial judge polled
each juror, and they all said they could follow the instruction.[7] 
Though the evidence of Joshua=s death was inflammatory, we disagree that
it was so inflammatory that, despite what each juror told the trial judge, the
jury could not ignore it.  Appellant asserts that the judge=s efforts to cure
the prejudice actually exacerbated it, but she never complained to the trial
court or asked for less extensive corrective measures.  Further, she cites no
authority showing that a judge should be criticized for taking extensive steps
to remedy an unfortunate situation.  Indeed, we must put faith in the jury=s ability to
disregard prejudicial events when so instructed, and surely a judge=s efforts to
explain and emphasize to the jury the importance of this obligation should be
commended.  Moreover, given the egregious nature of the charged offense and the
volume of evidence supporting appellant=s guilt, even
without any mention of Joshua=s death, conviction was fairly certain.

The evidence of Joshua=s death, though
prejudicial, was only incrementally more damaging than the evidence already
before the jury.  The trial judge gave extensive instructions to disregard,
which every juror said he or she could follow.  Under these circumstances,
including the nature of the offense and evidence supporting guilt, the judge
acted reasonably in believing his instructions to disregard were effective to
cure any prejudice from the remark.  Thus, we conclude the trial court did not
abuse its discretion in denying appellant=s motion for
mistrial, and we overrule appellant=s sixth issue.








                                                 III.  Conclusion

The trial court did not abuse its discretion in admitting
appellant=s children=s medical records
and the summary of the interview with Robert Austin, Sr. or in refusing to
grant appellant=s motion for a mistrial.  We affirm the
trial court=s judgment.

 

 

 

 

/s/      Leslie B. Yates

Justice

 

 

 

 

Judgment rendered
and Opinion filed April 10, 2007.

Panel consists of
Chief Justice Hedges and Justices Yates and Seymore.

Publish C Tex. R. App. P. 47.2(b).









[1]  The State claims appellant failed to preserve error
regarding these two issues because she did not specify, either to the trial
court or to this court, exactly which portions of these thousands of pages of
records she claims are inadmissible.  We disagree.  Appellant=s arguments are specific enough to put the State on
notice that she challenges the State=s
entire theory of using her children=s
medical records to establish MSBP.  Though highlighting particular incidents,
the State did not rely on isolated incidents but on the overall pattern of
behavior established by analyzing the entire set of records.  Appellant=s trial court objection and appellate briefing are
consistent with how the State tried the case.  We conclude that appellant has
preserved error regarding her first two issues.





[2]  Appellant argues that the motive exception does not
apply here because Dr. Bramlette testified that what motivates people with MSBP
is not completely understood.  Although the motivation of many criminals may be
difficult to understand, the general admissibility of motive evidence is well
established.  Further, motive evidence need only Atend to raise an inference that the accused had a motive to commit the
alleged offense.@  Bisby v. State, 907 S.W.2d 949, 958 (Tex.
App.CFort Worth 1995, pet. ref=d).  Thus, even if the MSBP evidence did not
conclusively establish appellant=s
motive, the evidence at least tended to raise an inference regarding it.





[3]  Appellant mentions in her brief that this first psychological evaluation contains Acomments and statements made by appellant=s family members, including Robert Austin, Sr.@  Her brief then focuses exclusively on the Robert
interview summary.  The State argues appellant has waived error regarding
statements in the evaluations made by any family members other than Robert
because of inadequate briefing.  We do not interpret appellant=s brief as raising an issue as to these other
statements, but to the extent her brief can be so interpreted, we agree with
the State that such arguments would be waived.  See Tex. R. App. P. 38.1(h).  The State
also argues that appellant waived her Rule 404(b) argument by failing to
itemize to the trial court the specific prior bad acts she contests.  It is
apparent from the context of her objection that appellant was complaining about
the entire interview summary, which is basically a list of accusations of bad
conduct.  We find appellant=s objection to
be sufficiently specific to preserve error in this case.  See Tex. R. App. P. 33.1(a)(1)(A).





[4]  In her fifth issue, appellant argues the evidence was also inadmissible
under Rule 404(b), arguing that the extraneous conduct Robert described was
being admitted to show appellant acted in conformity therewith.  Because we
have already concluded the evidence is admissible under Rule 705(a) even if
otherwise inadmissible, we need not address this issue.





[5]  In its brief, the State claims that any error must
be harmless because the jury never viewed or requested the psychological evaluation exhibit, but this is incorrect.





[6]  Appellant also asserts that the State intentionally
asked suggestive questions to a witness it had failed to admonish not to
discuss Joshua=s death, thereby engaging in misconduct that magnifies
the prejudice.  This court has previously considered whether a prosecutor
solicited the improper testimony as a factor in determining whether the trial
court erred in refusing to grant a mistrial.  See Hudson, 179 S.W.3d at
738.  The prosecutor denied intentional misconduct and explained that he had
forgotten to admonish the witness because (1) he had no contact with her
pretrial, given that she was a member of appellant=s family,(2) he had called her to testify at the last
minute, and (3) he had expected her to testify the next morning rather than the
end of the day and had planned to talk with her in the morning.  The trial
judge did not find that the prosecutor had engaged in intentional misconduct,
instead scolding him that he should have gotten help in preparing and trying
the case.  Given the information before the judge, we cannot say he abused his
discretion in failing to find intentional misconduct.





[7]  Several courts have considered jurors= assurances upon being polled that they could follow
the trial court=s instructions as a factor in determining whether a
mistrial was required.  See, e.g., Perkins v. State, No. 74,318,
2004 WL 3093239, at *2B3 (Tex. Crim. App. June 30, 2004), cert. denied,
543 U.S. 1164 (2005); Bustamante v. State, 106 S.W.3d 738, 742, 744
(Tex. Crim. App. 2003); Grotti v. State, 209 S.W.3d 747, 777 (Tex. App.CFort Worth 2006, pet. filed); Jones v. State,
100 S.W.3d 1, 5 n.3 (Tex. App.CTyler 2002,
pet. ref=d).