[No. B216358. Second Dist., Div. Three. Apr. 28, 2011.]

KELLEY ANGELA BELL, Plaintiff and Respondent, v.
REGINALD MASON et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[]].

COUNSEL

Klapach & Klapach and Joseph S. Klapach for Defendants and Appellants.

Law Offices of Armen M. Tashjian and Armen M. Tashjian for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendants and appellants Reginald Mason (Reginald) and Shante Mason (Shante)[1] (collectively, the Masons) appeal a $700,000 judgment in favor of plaintiff and respondent Kelley Angela Bell (Bell) following a jury trial, as well as a postjudgment order awarding Bell $204,500 in attorney fees.

Bell sold her house to Shante for $130,000. Bell then sued the Masons alleging she "suffers from mental retardation"[2] and that the Masons "took advantage of plaintiff's disabilities in gaining her trust and inducing her to enter into the transaction which deprived her of her home."

The defense theory is that Bell is of normal intelligence and that she knowingly entered into an arm's-length transaction with Shante for the sale of her property. At trial, the defense sought to call Dr. Samuel Black (Black) as an expert psychiatric witness to testify Bell is not mentally retarded and that she in fact has average intelligence. The trial court ruled Black could not testify regarding Bell's mental retardation or lack thereof. Although Black had reviewed, inter alia, Bell's medical records and had viewed in excess of 15 hours of her videotaped deposition, the trial court ruled that because Black had not met or personally examined Bell, the defense had failed to lay a sufficient foundation for Black to testify as to Bell's IQ or mental retardation.

In the published portion of this opinion, we conclude a sufficient foundation was shown for Black's testimony; the mere fact Black had not personally examined Bell did not preclude him from testifying as to her mental capacity. Reversal is required because the trial court's ruling amounted to prejudicial evidentiary error which eviscerated the defense case and left the jury with plaintiff's uncontroverted expert testimony that Bell is mentally retarded. (Evid. Code, § 354.)

In the unpublished portion of the opinion, we conclude that irrespective of the trial court's erroneous evidentiary rulings which inured to Bell's benefit, Bell failed to present substantial evidence to support her claims of fraud, intentional infliction of emotional distress, dependent adult abuse and conspiracy. Therefore, the trial court's evidentiary errors do not require this matter to be remanded for a new trial. Instead, we reverse and remand to the trial court with directions to enter judgment in favor of the Masons.

---

[1] We refer to the individual appellants by their first names for purposes of clarity.

[2] Although "developmentally delayed" is now the preferred term, the term "mentally retarded" was used in the pleadings and in the testimony at trial. We use the latter term in order to accurately reflect the record.

## FACTUAL AND PROCEDURAL BACKGROUND

1.  *Overview.*[3]

    a.  *Bell's acquisition and encumbering of the subject real property.*

John Williams and Asa Williams (the godparents) were an elderly childless couple who frequently took care of Bell when she was a child. Bell went to the library and read about grant deeds and how to transfer real estate. On or about September 2, 2003, title to the Williamses' real property located on 4th Avenue in Los Angeles (the property) purportedly was transferred by grant deed to Bell as a gift. At the time, there were no encumbrances on the property.

On September 16, 2003, two weeks after obtaining title to the property, Bell obtained a $65,000 loan on the property from JMJ Financial Group (JMJ), secured by a deed of trust, at a rate of 12 percent per annum. The interest rate was high because Bell had poor credit.

In October 2003, Bell moved Asa Williams to a convalescent hospital. John Williams, who was in poor health, died in December 2003.

As will be explained in greater detail below, in November 2003, Bell entered into an agreement to sell the property to Shante for $130,000.

    b.  *Bell's godmother sues Bell to recover title to the property; Bell enters into a settlement agreement with the godmother's conservator, obligating Bell to prosecute the instant lawsuit.*

On April 19, 2004, Asa Williams filed a complaint (the *Williams* action) against Bell, Shante, Vernon Washington and Wendell Bonville (Bonville), seeking to quiet her title to the property and declaratory relief, and alleging causes of action for fraud, civil conspiracy, negligent and intentional infliction of emotional distress. Asa Williams alleged Bell "caused a transfer of title of the PROPERTY by fraudulent means by signing the name of WILLIAMS on said Grant Deed of September 2, 2003. That BELL made said illegal transfer of the PROPERTY for the sole purpose of obtaining a monetary loan in the amount of $62,000.00 and thereby placing a lien against the PROPERTY for said amount."[4]

---

[3] The facts are gleaned from the record, including excerpts from Bell's deposition testimony. Those deposition excerpts, although erroneously excluded by the trial court, were presented below in a defense offer of proof and are part of the record on appeal. Defense counsel's written offers of proof below ensured an adequate record for appellate review.

[4] The record is inconsistent with respect to the amount Bell borrowed against the property, whether it was $62,000 or $65,000 or some other amount. The amounts set forth in the opinion are drawn from the record.

Asa Williams subsequently was placed under a conservatorship.

On July 7, 2005, Asa Williams died intestate, without leaving any heirs at law.

On October 12, 2005, Asa Williams's conservator, Harold Johnson (Johnson), entered into a settlement agreement and mutual release with Bell.[5] The settlement agreement did not require any cash outlay by Bell. The settlement agreement noted the existence of claims by Bell against Shante, Bonville and others regarding the subject real property and the refinancing of the property and stated, *"Bell agrees to pursue such claims.* [¶] 4. In the event Bell recovers on the Claims set forth in paragraph 3 above, . . . Bell agrees to pay Johnson one half of all amounts recovered or the value of all property recovered, less the sum of . . . [$11,500]." Thus, Bell's prosecution of the instant lawsuit against the Masons was required by the promise Bell made to the conservator in the *Williams* settlement agreement.

2. *The instant lawsuit.*

On January 9, 2007, Bell, by and through a guardian ad litem, Ella Bell Gory, filed the operative first amended complaint against the Masons, Bonville, as well as JMJ, Gateway Loans, Inc. (Gateway), and Horizon Escrow, Inc. (Horizon). The complaint sought, inter alia, to quiet title in Bell as the sole owner in fee simple of the subject real property she obtained from the Williamses. Bell alleged she obtained the property by grant deed in September 2003, and that she borrowed $64,000 against the property one month later.

The complaint alleged two distinct acts of wrongdoing.

First, Bell alleged her former boyfriend, Bonville, forged her signature on the net loan proceeds of $51,971 and converted the money to his own use.

Second, Bell alleged she was defrauded in the transaction wherein she sold the property for $130,000 to Shante. "On or about January 22, 2004, plaintiff purportedly sold the 4th Avenue Property to Shante Mason (the 'Sale') *pursuant to the representation that the sale was a mere sham intended to gain the necessary credit rating to furnish funds to repair the premises.*" (Italics added.) However, *instead of treating the sale as a sham,* as had been agreed, defendants treated the sale as real and evicted her from the property in 2006.

---

[5] The trial court granted Bell's motion in limine to exclude evidence relating to the *Williams* litigation, on the ground said evidence was irrelevant. However, this evidence, including the *Williams* complaint and the settlement agreement, was highly relevant, was before the trial court by way of a defense offer of proof, and is germane to the issues raised on appeal.

Bell pled the various defendants "relied on their knowledge that plaintiff suffers from mental retardation"[6] and "took advantage of plaintiff's disabilities in gaining her trust and inducing her to enter into the transaction which deprived her of her home."

Based on these allegations, Bell asserted claims for fraud and deceit, conversion by Bonville of the $51,971 loan proceeds, financial dependent adult abuse (Welf. & Inst. Code, §§ 15600 et seq., 15610.30), breach of fiduciary duty, intentional infliction of emotional distress, conspiracy, negligence and common count for monies received. Bell sought damages, quiet title, imposition of a constructive trust and an accounting.

Prior to trial, JMJ, Gateway and Horizon were dismissed from the case, and the trial court granted summary adjudication in favor of the Masons on Bell's quiet title claim. The trial court struck Bonville's answer as a discovery sanction and entered Bonville's default. Thus, the sole claims in issue are Bell's claims against the Masons arising out of her sale of her property to Shante.

### 3. *Trial testimony.*

In determining whether the trial court committed prejudicial evidentiary error in excluding certain defense evidence (Evid. Code, § 354), the inquiry is whether "it appears reasonably probable that were it not for the trial court's incorrect evidentiary rulings, a result more favorable to [appellant] could have been obtained. [Citation.]" (*Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1040 [81 Cal.Rptr.3d 756].) We summarize the evidence mindful of this standard.

### a. *Plaintiff's case.*[7]

Under Bell's theory of the case, the parties had agreed to treat the $130,000 sale of the property to Shante as "a mere sham" and that Bell

---

[6] With respect to Bell's intellectual capacity, the record reflects Bell attended high school, dropped out at the beginning of the 10th grade, attended a 90-day GED program and obtained a GED high school equivalency certificate. Thereafter, Bell attended a junior college for one semester, where she studied child development but did not obtain a certificate. Bell's ambition was to become a teacher. She was able to keep up with the college course work. She dropped out because she had to take care of her father, not because the work was too hard. Bell performed research at the library on real estate transfers and grant deeds, and she is a reader of the Los Angeles Times real estate section. Also, Bell interviewed various lawyers to represent her, she tried to get a sense of their knowledge and experience, and she felt she "could fairly judge and decide who [she] wanted" to represent her.

[7] We note that the respondent's brief is largely devoid of discussion of the evidence which plaintiff presented to the jury. Instead, the respondent's brief, in its summary of the evidence, cites primarily to plaintiff's pleadings.

"would continue in reality to own the 4th Avenue Property." However, the Masons breached the agreement by treating the sham sale as a valid conveyance and evicting her from the premises. Thus, under Bell's theory, Shante's payment to her of $130,000, to enable Bell to remain in her home, was essentially a gift from a generous stranger. (Bell and Shante had never met.) If Bell's version of the agreement were believed, she was entitled to remain in the house rent free as the purported actual owner.

### (1) *Direct examination of plaintiff's expert.*

To establish her mental incapacity, Bell presented the expert testimony of Dr. Catherine Scarf, a practicing psychologist. Scarf testified she had administered various performance and verbal tests to Bell, which disclosed Bell's IQ is 62, placing her in the bottom first percentile. Scarf opined Bell is incapable of entering into contracts.

Scarf explained that, in diagnosing mental retardation, according to the DSM (Diagnostic and Statistical Manual of Mental Disorders), "which is what you use to diagnose mental retardation, mental retardation has to be established prior to the age of 18." Here, Scarf evaluated Bell at *age 37*, at which time Bell was first diagnosed with mental retardation, but Scarf opined Bell's history over the years indicated mental retardation.

### (2) *Cross-examination of Scarf.*

Cross-examination disclosed Scarf evaluated Bell at the request of Bell's attorney, Armen Tashjian (Tashjian) (Bell's trial and appellate counsel). Cross-examination revealed the circumstances under which Scarf came to evaluate Bell. The trial court admitted into evidence exhibit 423, a letter from Tashjian to Donetta Germany that went into Bell's file. The letter stated in pertinent part: "*I wish to explain briefly why Kelley Bell has an urgent need for evaluation by a psychiatrist or licensed psychologist who has practiced for at least five years.* Ms. Bell is represented by this law firm in the above-referenced litigation. This lawsuit involves individuals who use deceptive tactics to take away Ms. Bell's residence, effectively rendering her homeless for several months. She seeks compensation for her damages." (Italics added.)

Thus, on August 18, 2006, Tashjian referred Bell to Scarf to obtain a capacity declaration for the court to determine whether a conservator should be appointed for Bell.[8] Bell came to Scarf's office on August 24, 2006,

---

[8] The capacity declaration completed by Scarf diagnosed Bell with mild mental retardation and depressive order and opined the proposed conservatee lacked the capacity to give informed consent to any form of medical treatment.

accompanied by Donetta Germany, who gave Scarf information regarding Bell's adaptive functioning.

Scarf admitted intelligence tests can be "faked out" by performing below one's ability. However, Scarf asserted "you can't fake me out" because she looks at other data besides test scores. However, Scarf stated she was not familiar with what is tested on a GED examination, and therefore could not address the impact of Bell's completion of a GED on her assessment.[9] Scarf also was unaware that Bell has a driver's license. Scarf did not look at Bell's high school records. She did not inquire about Bell's employment history. She did not look at any retainer agreement between Bell and Tashjian. She did not read the transcript of Bell's deposition or view the videotape of Bell's deposition to assess Bell's intellectual capacity. Scarf did not know whether Bell was capable of doing research at the library, and did not inquire of Bell as to her real estate knowledge or experience.

Scarf stated she ordinarily checks different sources to confirm whether what she was being told was accurate. In this case, however, Scarf did not consult with anyone other than Tashjian's office and Donetta Germany, who accompanied Bell to Scarf's office.

> b. *Defense case.*

As will be discussed below, in the Discussion, the trial court precluded the defense expert, Black, a highly qualified licensed psychiatrist, from testifying "as to IQ or retardation of Ms. Bell," stating "I do not believe there's been a sufficient foundation laid for that," in that Black had not personally evaluated Bell. The trial court limited Black's testimony to depression and personality disorder. As a consequence, the jury was left with Scarf's uncontroverted expert testimony that Bell has an IQ of 62.

The defense theory of the case was that Bell lied about being a helpless person who was taken advantage of, that Bell improperly acquired the property from her godparents, immediately extracted as much equity as she could, given her poor credit, and then sold the property to Shante in order to extract additional money from the property. The defense contended Bell

---

[9] We take judicial notice of the fact that to pass the GED high school equivalency examination, one must be "able to read, compute, interpret information, and express [one]self in writing on a level comparable to that of 60 percent of graduating high school seniors." (<http://www.acenet.edu/Content/NavigationMenu/ged/faq/index.htm#do-to-pass> [as of Apr. 28, 2011]; see Evid. Code, §§ 452, subd. (h), 459.) Scarf did not explain how someone in the bottom first percentile of human intelligence is capable of performing at the level required to pass the GED examination. Despite the weakness of Scarf's expert testimony, the trial court's exclusion of defense expert testimony left the trier of fact with plaintiff's uncontroverted expert testimony that Bell is mentally retarded.

knowingly entered into an arm's-length transaction with Shante for the sale of the property, and the sale price was fair in light of prevailing market conditions as well as the dilapidated condition of the property. Specifically, there was a gaping hole in the bathroom floor, the subfloor had rotted out, the heating and plumbing systems were inadequate, the garage was falling down, the siding was dilapidated, and the house was slightly off its foundation.

Of the $130,000 purchase price,[10] Bell received a check in the amount of $21,114 in net proceeds. The remainder was disbursed as follows: $65,000 went to repay Bell's prior loan from JMJ; $8,500 went for repairs to the property; $1,300 went to pay a 1 percent broker's commission to Reginald; about $6,500 went to pay closing costs, title charges and escrow fees; and $27,500 went to an entity owned by Reginald to be held back as a security deposit for Bell's tenancy, allegedly representing two years of future rent.

### c. *Verdict.*

The jury returned special verdicts, finding, inter alia, there was a conspiracy between Bonville and the Masons to defraud Bell; Reginald made a false representation of fact to Bell,[11] upon which she reasonably relied; and Bell was a dependent adult at the time of the conduct. As against the Masons, the jury awarded Bell $200,000 for past economic loss, $100,000 for past noneconomic loss, and $100,000 for future noneconomic loss. In addition, Reginald and Shante were ordered to pay Bell punitive damages in the sums of $200,000 and $100,000, respectively. Thus, Bell was awarded a total of $700,000 in damages.

### d. *Motion for new trial.*

The Masons brought a motion for new trial, raising numerous grounds including (1) abuse of discretion by the trial court in its evidentiary rulings and (2) juror misconduct, based on concealment by two jurors of their personal experience with mental disabilities.

On May 19, 2009, the trial court denied the motion for new trial.

On May 26, 2009, the Masons filed a timely notice of appeal from the judgment.

---

[10] Shante's lender appraised the property at $190,000. Two years later, Shante sold the property for $365,000.

[11] This finding is contrary to Bell's deposition testimony that Reginald never said anything that led Bell to believe he intended to defraud her, as discussed in the unpublished portion of this opinion.

e. *Attorney fees.*

On June 22, 2009, Bell moved for an award of attorney fees in the amount of $409,000, on the ground she had prevailed on her claim under the Elder Abuse and Dependent Adult Civil Protection Act, and therefore was entitled to statutory attorney fees under Welfare and Institutions Code section 15657.5, subdivision (a).

On July 23, 2009, the trial court awarded a total of $204,500 in attorney fees, including $167,100 to Tashjian.

On September 1, 2009, the Masons filed a timely notice of appeal from the postjudgment order for attorney fees.

## CONTENTIONS

The Masons contend the trial court erred in excluding evidence relating to critical issues in the case and thereby prevented the defense from presenting its theory of the case; the trial court erred in admitting certain evidence; Bell failed to present sufficient evidence to support her claims of conspiracy, fraud, dependent person abuse, and intentional infliction of emotional distress; the trial court erred in refusing to grant a new trial based upon juror misconduct; the judgment should be reversed due to cumulative error; and the attorney fee award to Bell should be vacated.

## DISCUSSION

1. *Trial court committed prejudicial evidentiary error in precluding defense expert Black from testifying that Bell is not mentally retarded.*

a. *Proceedings.*

At trial, the defense sought to call Black as an expert psychiatric witness to testify Bell does not suffer from mental retardation and that in fact she has average intelligence. The trial court conducted a hearing outside the presence of the jury to determine the admissibility of this testimony.

The record reflects Black has solid credentials. He is a licensed psychiatrist with 38 years of experience. He is on the teaching faculty at UCLA's (University of California at Los Angeles) medical school. Further, Black read Scarf's trial testimony in its entirety and reviewed the records that Scarf produced which Scarf testified were the basis for her opinion. In addition, Black read all three volumes of Bell's deposition testimony and viewed in excess of 15 hours of her videotaped deposition testimony.

Black explained that psychiatrists commonly offer opinions based on information acquired through means other than personal examination of a patient. Black also explained that IQ testing is just one way to gain information about a patient, but IQ tests are not normally used in litigation because the person being tested is capable of skewing the results. Also, "there's a very strong feeling in psychology that in the minority population, giving the IQ tests that are available [is] not an accurate indication of the IQ of the minority groups" because the tests are culturally biased in favor of the White middle-class population.

Black offered examples from his review of Bell's deposition that helped him form his opinion that Bell is not mentally retarded. Black cited Bell's ability to read rapidly and clearly from the escrow instructions, and that she remembered her credit union account number.

The trial court ruled Black could not testify regarding Bell's mental retardation or lack thereof. The trial court was not concerned with Black's training or qualifications. The trial court's sole concern was that Black had not met or personally examined Bell, and therefore the defense had failed to lay a sufficient foundation for Black to testify as to Bell's IQ or mental retardation.[12]

    b.   *Exclusion of Black's opinion regarding mental retardation was erroneous; the fact Black did not personally examine Bell did not affect the admissibility of the evidence but merely went to the weight of his testimony.*

Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, *that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates,* unless an expert is precluded by law from using such matter as a basis for his opinion." (Italics added.)

The trial court's stated reliance on *People v. Bassett* (1968) 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777], a death penalty case, was misplaced. In *Bassett,* the issue presented was whether the testimony of two prosecution

---

[12] The trial court's ruling was internally inconsistent and illogical. Although the trial court concluded Black's failure to personally examine Bell precluded Black from opining as to mental retardation, the trial court stated "I will allow the psychiatrist to testify about depression and personality disorder."

experts, neither of whom had examined the defendant in person and who testified on the basis of a lengthy hypothetical question posed by the prosecutor (*id.* at p. 140), could "be deemed 'substantial' evidence to support the implied finding of defendant's mental capacity on the guilt phase of [the] trial" (*id.* at p. 146). Although said expert testimony did not constitute substantial evidence, *Bassett* added: "*We do not imply, of course, that the testimony in question was inadmissible. Assuming the necessary minimum acquaintance with the case in which he is called to testify, 'the extent of an expert's knowledge goes to the weight of his testimony, rather than to its admissibility'* (*Estate of Schluttig* (1950) 36 Cal.2d 416, 424 [224 P.2d 695]). And this rule has recently been applied to the sanity testimony of a psychiatrist who was not permitted to conduct a personal examination of the defendant. (*People* v. *Brekke* (1967) 250 Cal.App.2d 651, 661–662 [58 Cal.Rptr. 854].)" (*Bassett, supra,* 69 Cal.2d at p. 146, fn. 22, some italics added; accord, *People v. Phillips* (1981) 122 Cal.App.3d 69, 85 [175 Cal.Rptr. 703] ["the fact that Dr. Blinder's testimony was based in large measure upon reports by others rather than upon his personal observations of the defendant or of other persons displaying that syndrome *may affect the weight of his testimony but does not render that testimony inadmissible* if those reports meet the standard of reasonable reliability" (italics added)].)

Here, Black had more than the "necessary minimum acquaintance with the case in which he [was] called to testify." (*Bassett, supra,* 69 Cal.2d at p. 146, fn. 22.) As noted, Black read Scarf's trial testimony in its entirety and he reviewed the records that Scarf produced which Scarf testified were the basis for her opinion. In addition, Black read all three volumes of Bell's deposition testimony and viewed in excess of 15 hours of her videotaped deposition testimony. Therefore, Black established a solid foundation for his testimony. The trial court's exclusion of Black's expert opinion that Bell has normal intelligence was clearly erroneous.[13]

### c. *Erroneous exclusion of Black's testimony was prejudicial.*

As pled in the complaint, Bell's theory of the case is that she "suffers from mental retardation" and that the Masons "took advantage of plaintiff's disabilities in gaining her trust and inducing her to enter into the transaction which deprived her of her home." The exclusion of Black's expert opinion that Bell has normal intelligence eviscerated the defense case and left the jury with uncontroverted expert testimony by Scarf that Bell is mentally retarded. This prejudicial evidentiary error requires reversal of the judgment.

---

[13] Bell asserts the trial court properly barred Black from testifying she is not mentally retarded because Black admitted he formed an opinion about her lack of retardation beginning with his review of Bell's deposition, *before* he obtained Bell's medical records. The argument is meritless. The manner in which Black evaluated Bell's mental capacity goes to the weight of Black's opinion, not to whether a proper foundation was shown for Black's expert testimony.

[[]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment and the postjudgment attorney fee order are reversed and the matter is remanded to the trial court with directions to enter judgment in favor of the Masons. The Masons shall recover their costs on appeal.

Croskey, J., and Aldrich, J., concurred.

A petition for a rehearing was denied May 17, 2011, and on May 5, 2011, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied July 27, 2011, S193770. Werdegar, J., did not participate therein.

---

*See footnote, *ante*, page 1102.